UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.<br><br>                              *Plaintiff*,<br><br>       v.<br><br>SHORE TRANSIT, *et al.*,<br><br>                              *Defendants*. | Civil Action No. __-___ |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR A PRELIMINARY INJUNCTION**

Brian M. Hauss*
American Civil Liberties
  Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
bhauss@aclu.org

Robin R. Cockey, Federal Bar No. 02657
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
T: 410.546.1750
F: 410.546.1811
rrcesq@cbmlawfirm.com

* *pro hac vice* application forthcoming        *Counsel for Plaintiff*

## INTRODUCTION

Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") respectfully requests that the Court grant its Motion for Preliminary Injunction and enjoin Defendants from enforcing Shore Transit's unconstitutional policy of censoring advertisements that Shore Transit deems "political," "offensive," "controversial," "objectionable," or "in poor taste."

PETA, the largest animal rights organization in the world, created two advertisements to advocate against the pain caused to animals by the meatpacking industry and the harms caused to workers by keeping Eastern Shore slaughterhouses operational during the COVID-19 pandemic. PETA seeks to place these advertisements on buses operated by Shore Transit, the public

1

transportation system for the Lower Eastern Shore of Maryland. Shore Transit refuses to accept PETA's advertisements, on the grounds that they are "too offensive for [its] market and political in nature."

Shore Transit is obligated to follow the Constitution. Its policy banning advertisements that it deems to be "political," "controversial," "offensive," "objectionable," or "in poor taste" violates the First Amendment. Even assuming, for the purposes of this preliminary injunction motion, that Shore Transit's advertising space constitutes a limited or nonpublic forum, Shore Transit's restriction on advertising must be reasonable and viewpoint neutral. Shore Transit's policy is neither.

*First*, Shore Transit's policy is incapable of reasoned application. Shore Transit has not issued any guidance to help officials determine what topics are "political," "controversial," "offensive," "objectionable," or "in poor taste." Like the restrictions on "political" speech struck down in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), Shore Transit's advertising restrictions are unconstitutional because they fail to provide objective and workable rules for distinguishing between permitted and prohibited speech.

*Second*, Shore Transit's policy is viewpoint discriminatory because it bans speech that Shore Transit deems to be "controversial," "offensive," "objectionable," or "in poor taste."  As the Supreme Court recently held in *Matal v. Tam*, 137 S. Ct. 1744 (2017), and *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019), government restrictions on "offensive," "immoral," or "scandalous" speech constitute impermissible viewpoint discrimination.

*Finally*, Shore Transit's policy is unconstitutionally vague because it fails to provide adequate notice about what speech is prohibited and because it invites arbitrary or selective enforcement by Shore Transit's officials.

For these reasons, and as explained further in this Memorandum, PETA is likely to succeed on the merits of its facial and as-applied First and Fourteenth Amendment claims. Because PETA's constitutional rights are being violated, PETA is suffering irreparable harm, and both the balance of harms and the public interest weigh heavily in favor of the issuance of an injunction.

Accordingly, the Court should grant PETA's motion for a preliminary injunction.

## BACKGROUND

**I.       Shore Transit's Advertising Spaces and Ad Review Process**

Shore Transit, a division of the Tri-County Council for the Lower Eastern Shore of Maryland, is a regional public transportation authority. It operates the public bus system in Somerset, Wicomico, and Worcester Counties. According to its own website, advertising with Shore Transit is "one of the best investments companies make with their advertising dollars." *See* Shore Transit, *Advertising*, https://bit.ly/3A9ARs4 (last accessed Aug. 12, 2021). Shore Transit encourages businesses and organizations to print their ads on the exterior and interior of their buses, in bus shelters, and on trash receptacles. These spaces "open the door on a highly visible medium for reaching large audiences of all ages, backgrounds and incomes." *Id.* Advertising with Shore Transit "allow[s] advertisers to speak directly to transit riders with these external traveling billboards" and provides access to a broad audience, allowing "you to communicate with families and professionals in their vehicles, people walking or shopping and tourists finding their way on the Lower Eastern Shore of Maryland." *Id.*

Shore Transit contracts with an advertising agent, Vector Media, to manage its advertising program. Vector Media sells advertising space on behalf of Shore Transit on static displays on commuter buses, bus shelters, and trash receptacles. In 2020 alone, Shore transit placed eighty-seven advertisements on its advertising spaces and collected more than $98,900 in revenue.

Declaration of Robin R. Cockey ("Cockey Decl."), Exh. F at 1.

On March 24, 2021, PETA filed a Maryland Public Information Act request with the Tri-County Council. Cockey Decl., Exh. A. PETA's MPIA requests sought, *inter alia*, "[a]ll documents relating to Shore Transit's standards for accepting or rejecting advertisements, including any advertising policy Shore Transit may administer" and "[a]ll documents concerning Shore Transit's reasons for approving, not approving, or requesting modifications to advertisements submitted for Shore Transit's system, including any communications with entities that submitted advertisements for approval." *Id.* at 1, 3. In its responses to these requests, the Tri-County Council produced the following documents: Shore Transit's contract with Vector Media; meeting and agenda minutes; email correspondence concerning Shore Transit's rejection of proposed advertisements promoting cannabis and cannabidiol (CBD) products; and the Maryland Locally Operating Transit System (LOTS) manual. Cockey Decl., Exh. B.

The minutes from the July 29, 2015 meeting of the Executive Board of the Tri-County Council for the Lower Eastern Shore of Maryland report that Shore Transit's advertising agency "asked if political advertisements are to be accepted." Cockey Decl., Exh. E at 9. The minutes explain that, "[f]ollowing discussion, the Executive Board decided to bring the matter before the Tri-County Council at the September meeting." *Id.* The minutes for the September 23, 2015 meeting reflect that the Tri-County Council discussed the matter and voted, deciding "to not accept political ads." *Id.* at 14.

Shore Transit's contract with Vector Media states that "Vector Media shall follow minimum standards in the approval of submitted advertising that will be displayed in the buses. . . . Political advertisements will not be accepted." Cockey Decl., Exh. D at 18. Shore Transit's contract with Vector Media further states that "Shore Transit . . . reserves the right

4

to reject any advertising that it determines to be controversial, offensive, objectionable or in poor taste." *Id.* at 16. The contract also states that Shore Transit "reserves the right to remove any offensive advertising at any time." *Id.* at 18. The Tri-County Council did not identify any other written policies defining the terms "political," "controversial," "offensive," "objectionable," or "in poor taste."

In addition to the advertisements at issue in this case, documents produced by the Tri-County Council in response to PETA's public records request identify only one other set of advertisements that have been rejected by Shore Transit— commercial advertisements for medical marijuana and cannabidiol (CBD) products. On February 28, 2018, a senior account executive at Vector Media emailed Brad Bellacicco, the Director of the Shore Transit Division of the Tri-County Council, informing him that Vector Media had "been approached by several companies in the Medical Cannabis business that would like to spend money on transit advertising in Maryland" and asking whether Shore Transit would accept these advertisements. Cockey Decl, Exh. E at 17. On March 13, 2018, Mr. Bellacicco responded: "I have referred your question to [the Maryland Transit Administration] and the [Tri-County Council] Board. I doubt we will take their money because we are still firing people for smoking cannabis. Would be hypocritical to advertise it when we drug test." *Id.*

On March 10, 2020, Vector Media's regional manager, Mark Sheely, emailed Mr. Bellacicco to ask whether Shore Transit would accept advertisements from the Hi Tide Dispensary, which "offer[s] legal CBD products and medical Marijuana." *Id.* at 20. Mr. Bellacicco responded: "Sorry but no. We have Federal Transportation funding and comply with FTA Drug and Alcohol testing program. Would be hypocritical to advertise for marijuana and fire people for using it." *Id.* at 19. When Vector Media's representative asked

5

what the response would be if Hi Tide Dispensary "were only to advertise their CBD products," which are legal under both federal and Maryland law, Mr. Bellacicco responded: "No we need to be careful with the perception of supporting a position opposed to [the Federal Transit Administration] and risk our funding." *Id.*

## II.     Rejection of PETA's Proposed Advertisements

PETA is the largest animal rights nonprofit organization in the world, with more than 6.5 million members and supporters. Committed to fighting animal exploitation and asserting animals' rights to have humans consider their best interests and to be free from suffering, PETA advocates against the pain caused to animals in laboratories, in the food industry, in the clothing trade, and in the entertainment industry, as well as in other contexts.

Advertising is one of the major ways in which PETA carries out its advocacy campaigns, including on public transit systems. On May 12, 2020, PETA submitted two advertisements to Shore Transit via Vector Media, the advertising agency with which the public transit system contracts. One advertisement depicted a photo of a young girl with a chicken, with accompanying text reading "No One Needs to Kill to Eat. Close the slaughterhouses: Save the workers, their families, and the animals." Cockey Decl., Exh. C at 2. The other advertisement contained the same text, but the word "kill" was superimposed over an image of a knife with blood on it. *Id.* at 1. The advertisements were intended to advocate the closure of the slaughterhouses on the Eastern Shore and to encourage viewers not to purchase or eat animal food products. Vazquez Decl. ¶ 4.

Later that day, Mr. Sheely forwarded that request via email to Mr. Bellacicco, asking if Vector Media had permission to sell PETA the exterior bus advertisements. Cockey Decl., Exh. C at 4. On May 15, 2020, Mr. Sheely replied to PETA's advertisement requests. He wrote, "Below is the response from Shore Transit about the ads you requested to run on their buses.

"After considerable consideration, we will decline the PETA ads. We find them too offensive for our market and political in nature.'" Vazquez Decl., Exh. A.

On June 10, 2020, Gabe Walters, the PETA Foundation's Manager of Litigation and Legislative Affairs, sent a demand letter on behalf of PETA to Shore Transit, addressed to Joseph Mitrecic, Chair of Tri-County Council Executive Board. Vazquez Decl., Exh. B. The demand letter stated PETA's First Amendment concerns, asked for Shore Transit to send him any existing advertising policies, and requested that Shore Transit reverse its decision rejecting PETA's ads. *Id.* Mr. Walters requested that Mr. Mitrecic respond by June 17, 2020. *Id.* As of the date of this filing, PETA has not received any response to this demand letter.

On March 31, 2021, one week after PETA filed its MPIA request, Mr. Bellacicco forwarded the email chain between himself and Mr. Sheely to several other Tri-County Council members with a message stating that "[u]pon . . . Mark Sheely's recommendation and considering the COVID situation unfolding in the area poultry plants, it was decided not to accept these ads. In the past we have rejected one for marijuana dispensary on the grounds we drug test our drivers per Federal law and should not promote the produce [sic] on our buses. . . . Our contract with Vector does allow us to review and reject ads." Cockey Decl., Exh. C at 3.

On July 22, 2021, PETA wrote to Mr. Sheely to renew its request to run the proposed advertisements on Shore Transit's system. PETA asked for a response to its request by July 30. Vazquez Decl. ¶ 7; *see also* Vazquez Decl., Exh. C at 1. To date, PETA has not received a response to its request. Vazquez Decl. ¶ 7.

PETA still wishes to place the same advertisements, and similar advertisements, in Shore Transit advertising spaces. *Id.* ¶ 8. In addition, PETA anticipates that it will want to place other advertisements on Shore Transit's advertising spaces, and that, because of PETA's mission to

7

advocate against the purchase or creation of animal food products, Shore Transit is likely to reject those advertisements pursuant to its policy prohibiting advertisements that Shore Transit deems to be "political," "controversial," "offensive," "objectionable," or "in poor taste." *Id.* ¶¶ 8-9.

## ARGUMENT

Under Rule 65 of the Federal Rules of Civil Procedure, this Court must weigh four factors when deciding whether to grant a motion for preliminary injunction: (1) has the movant shown a reasonable probability of success on the merits; (2) will the movant be irreparably harmed by denial of the relief; (3) will granting preliminary relief result in even greater harm to the non-moving party; and (4) is granting preliminary relief in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008); *see also, e.g.*, *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

In cases involving the freedom of speech, the plaintiff's claimed irreparable harm is "inseparably linked" to its likelihood of success on the merits. *W.V. Ass'n of Club Owners*, 553 F.3d at 298.

**I.   PETA Is Likely to Succeed on the Merits of Its Claim Because Shore Transit Cannot Meet Its Burden to Justify Its Restrictions on Speech.**

The amount of flexibility the government has to restrict speech on government-controlled property—here, Shore Transit's advertising spaces— depends on the type of property at issue and whether it is a "traditional public," "designated public," or "nonpublic" forum. *See e.g.*, *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 383 (4th Cir. 2006); *Goulart v. Meadows*, 345 F.3d 329, 248-49 (4th Cir. 2003).

A "designated public forum" is government-owned property that does not qualify as a "traditional" public forum (e.g., city streets or parks), but which the government has intentionally "opened for expressive activity to the public." *Goulart*, 345 F.3d at 249 (citing *Warren v. Fairfax*

8

*Cty.*, 196 F.3d 186 (4th Cir. 1999) (en banc)).  Municipal advertising spaces, including advertisement spaces within city halls, public transit stations, and city buses have been found to be designated public fora based on the government's decision to open such places for public expression. *See Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth*, 148 F.3d 242, 249–55 (3d Cir. 1998) (public transportation stations); *Am. Freedom Def. Initiative v. Se. Pa. Transp. Auth.*, 92 F. Supp. 3d 314, 326 (3d Cir. 2015) (public buses); *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) (city buses); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074–81 (9th Cir. 2001) (city hall). Content-based restrictions on speech in a "designated public forum" are analyzed under strict scrutiny. *See e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009).

A "nonpublic forum," also known as a "limited public forum," is a venue that has not been opened to speech by the public. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (discussing definition of nonpublic forum). The government creates a "nonpublic forum" when it opens up space to the public for some main purpose other than facilitating speech in that space. For example, when the government operates a certain space as a polling place on Election Day and invites the public, subject to extensive regulations, into that space for the "sole purpose of voting," restrictions on speech within the polling place should be assessed under nonpublic forum analysis. *Mansky*, 138 S. Ct. at 1886. If the government intentionally opens up its property for speech only by certain groups or for certain expressive purposes, the property may also properly be analyzed as a nonpublic forum. *E.g.*, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (government could create student activities fund as a nonpublic forum restricted to student groups meeting certain criteria); *Child. of the Rosary v. City of Phoenix*, 154 F.3d 972, 977–78 (9th Cir. 1998) (holding that public transit

9

advertising space was a nonpublic forum because it was reserved exclusively for commercial advertising).

Content-based restrictions on speech in a nonpublic forum must be "both reasonable and viewpoint neutral." *Child Evangelism*, 457 F.3d at 383 (citing *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106–07 (2001)). This standard is "more exacting" than ordinary rational basis review, and the government bears the burden to prove the constitutionality of its restriction on the speech. *See Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993) (holding that reasonableness review is more stringent than rational basis review because government restrictions on speech affect "protected First Amendment activity that is entitled to special solicitude even in this nonpublic forum"); *White Coat Waste Project v. Greater Richmond Transit Co.*, 463 F. Supp. 3d 661 (E.D. Va. 2020) (citing *NAACP v. City of Phila.*, 834 F.3d 435, 441 (3d Cir. 2016)), *appeals filed*, Nos. 20-1710 (filed Jun. 30, 2020), 20-1740 (filed Jul. 8, 2020).

Regardless of whether Shore Transit's advertising space constitutes a designated public forum or a nonpublic forum, its policy is unconstitutional. *See Child Evangelism*, 457 F.3d at 383–84 (stating that the court "need not rule on [the] issue" of what type of forum elementary school's take-home flyer forum was because it found the regulation to be viewpoint discriminatory and because the regulation provided no guidelines limiting the school's discretion). First, Shore Transit's ban on advertisements that it deems to be "political in nature," "controversial," "offensive," "objectionable," or "in poor taste" is unreasonable because it is incapable of reasoned application by enforcement officials. Second, Shore Transit's prohibition on advertisements that it deems to be "controversial, offensive, objectionable, or in poor taste" is viewpoint discriminatory. Each of these reasons is independently sufficient to conclude that PETA is likely to succeed on the

merits of its First Amendment claim. Finally, Shore Transit's policy also violates the Fourteenth Amendment's Due Process Clause because it is unconstitutionally vague.

### A. Shore Transit's Policy Is Unconstitutional Because It Is Incapable of Reasoned Application.

Shore Transit's policy violates the First Amendment's baseline reasonableness requirement because it fails to "articulate some sensible basis for distinguishing what may come in from what must stay out," *Mansky*, 138 S. Ct. at 1888, and is therefore "not . . . capable of reasoned application," *id.* at 1892.

The Supreme Court's recent decision in *Mansky* is directly on point. There, the Court held that a Minnesota statute prohibiting the wearing of a "political badge, political button, or other political insignia" in a polling place violated the First Amendment. *Id.* at 1883 (quoting Minn. Stat. § 211B.11(1) (2017)). The Court accepted that the interiors of Minnesota's polling places on Election Day were a nonpublic forum for speech, *id.* at 1886; that Minnesota was pursuing a permissible objective in restricting speech in order to try to maintain a calm atmosphere in the polling places, *id.* at 1887; and that Minnesota had "good intentions" that were "generally worthy of [the Court's] respect," *id.* at 1892. Yet the Court still struck down the statute as unreasonable because Minnesota's restriction on speech was "not . . . capable of reasoned application." *Id.* at 1892. The Court explained:

> [The statute] does not define the term "political." And the word can be expansive. It can encompass anything "of or relating to government, a government, or the conduct of governmental affairs," Webster's Third New International Dictionary 1755 (2002), or anything "[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state," American Heritage Dictionary 1401 (3d ed. 1996).

*Id.* at 1888; *see also id.* ("Under a literal reading of [the cited dictionary definitions of 'political'], a button or T-shirt merely imploring others to 'Vote!' could qualify.").

11

Although Minnesota issued a written policy to guide the statute's enforcement, the policy failed to cure the vagueness inherent in the term "political." On the one hand, Minnesota's policy guidance was "clear enough," and likely capable of objective application, insofar as it construed the statute to prohibit "items displaying the name of a political party, items displaying the name of a candidate, and items demonstrating support of or opposition to a ballot question." *Id.* at 1889 (internal quotation marks and citation omitted). However, the policy's statement that the statute prohibited "[i]ssue oriented material designed to influence or impact voting" did little more than replace the statute's unclear terms with another equally murky phrase. The Court criticized the provision as "rais[ing] more questions than it answers," noting that Minnesota could not explain what qualifies as an "issue" other than to say that it included anything about which a political candidate or party has "taken a stance." *Id.* at 1889. The Court pointed out that it was impossible to determine, for example, whether the phrases "Support the Troops" or "#MeToo" would be banned, concluding:

> A rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable. Candidates for statewide and federal office and major political parties can be expected to take positions on a wide array of subjects of local and national import.

*Id.* at 1889–90.

The Court likewise concluded that Minnesota's policy statement that the statute banned items "promoting a group with recognizable political views" about "the issues confronting voters in a given election" also did not provide a sufficiently workable rule to save the statute. *Id.* at 1890. The Court questioned whether items featuring the ACLU, AARP, the World Wildlife Fund, or Ben & Jerry's would be banned because they all "have stated positions on matters of public concern," *id.* at 1890 & n.5, or whether merely wearing a uniform for the Boy Scouts of America

12

would be prohibited, *id.* Minnesota's attempt to narrow the ban to groups that are "sufficiently well-known" did not make the prohibition workable, because "that measure may turn in significant part on the background knowledge and media consumption of the particular election judge applying it." *Id.*

The Court emphasized that, even in nonpublic fora, there must be some objectively ascertainable boundaries on the government's discretion to restrict speech, observing that "it is 'self-evident' that an indeterminate prohibition carries with it 'the opportunity for abuse, especially where it has received a virtually open-ended interpretation.'" *Id.* at 1891 (cleaned up) (quoting *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)). Although the Court did "not doubt that the vast majority of [government officials] strive to enforce [the law] in an evenhanded manner," it emphasized that enforcement officials' discretion "must be guided by objective, workable standards." *Id.* Otherwise, the Court warned, there is an impermissible risk that a government official's "own politics may shape his view on what counts as 'political.'" *Id.*[1]

As several federal courts of appeals have already recognized, *Mansky* applies with full force to public transit systems' advertising policies. Last year, the Third Circuit applied *Mansky* in holding that the Southeastern Pennsylvania Transportation Authority's policy prohibiting

---

[1] *Mansky* is the most recent in a long line of Supreme Court precedents declaring that a restriction on speech violates the First Amendment if it does not meaningfully constrain the discretion of enforcement officials. *See e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 537–38 (1981) (Brennan, J., concurring) (collecting cases). In these cases, the Court has repeatedly cautioned that "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). *See also Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 372 (D.C. Cir. 2018) (noting that inquiries into "unbridled discretion," "vagueness," and "reasoned application" "all pose a single challenge: [To] determine whether [a restriction] is so broad as to provide [the government] with no meaningful constraint upon its exercise of the power to squelch").

advertisements that are "political in nature" or that address "political . . . issues" violated the First Amendment because it was incapable of reasoned application. *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 314–17 (3d Cir. 2020) [hereinafter *CIR*], *petition for cert. filed*, No. 20-1379 (filed Mar. 29, 2021). The Third Circuit reasoned that SEPTA's "ill-defined" restriction on "political" advertisements, combined with "the absence of guidelines cabining SEPTA's General Counsel's discretion in determining what constitutes a political advertisement," gave rise to an impermissible risk of arbitrary or selective application that rendered the challenged restrictions facially unconstitutional. *Id.* at 316.

Similarly, in *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation*, 978 F.3d 481 (6th Cir. 2020) [hereinafter, *AFDI v. SMART*], the Sixth Circuit held that the Detroit public transit system's policy banning "political" advertisements was incapable of reasoned application because it "offer[ed] no 'sensible basis for distinguishing what may come in from what must stay out.'" *Id.* at 485–86 (quoting *Mansky*, 138 S. Ct. at 1888). Like the Third Circuit in *CIR*, the Sixth Circuit observed that the absence of "written down 'objective, workable standards' to define the word 'political' and guide officials on the steps to take when deciding if specific ads qualify," significantly "increase[d] the opportunity for abuse" in [enforcement officials'] application of the policy. *Id.* at 497 (quoting *Mansky*, 138 S. Ct. at 1891). The court accordingly concluded that the public transit system "ha[d] yet to create the workable standards that it needs for 'reasoned application' of its ban." *Id.* (quoting *Mansky*, 138 S. Ct. at 1891–92).

Other courts have suggested in dicta that they would reach similar conclusions. In *Amalgamated Transit Union Local 1015 v. Spokane Transit Authority*, 929 F.3d 643 (9th Cir. 2019), the Ninth Circuit held that the Spokane Transit Authority's ban on "public issue"

14

advertising'—which the transit authority's CEO characterized "as a prohibition on ads that would generate 'public interest around issues about which there could be an economic, social or political debate,'" *id.* at 653—was unconstitutional as applied to the rejection of a labor union advertisement. The court did not invalidate the prohibition on its face, because the union did "not challenge the trial court's conclusion that STA's policy is definite and objective." *Id.* at 654. But it was skeptical that the transit authority's "public issue" standard would survive facial review, observing that the "standard lacks objective criteria to provide guideposts for determining what constitutes prohibited 'public issue' advertising." *Id.* at 655.

Along similar lines, in *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, 901 F.3d at 372 [hereinafter *AFDI v. WMATA*], the D.C. Circuit reversed a district court decision upholding WMATA's ban on "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions." *Id.* at 361, 373. The D.C. Circuit explained that *Mansky*, which was handed down after the appeal was fully briefed, "invites arguments about whether [WMATA's policy] is capable of reasoned application." *Id.* at 372. It concluded that, on remand, "AFDI should be given an opportunity to refine its argument and to supplement the record" with information about how the restriction has been applied, which would inform the analysis "as to whether it is capable of reasoned application." *Id.* at 373.

Shore Transit's undefined restrictions on advertisements that it deems "political," "controversial," "offensive," "objectionable," or "in poor taste" suffer from the same constitutional defects as the advertising policies struck down in *CIR* and *AFDI v. SMART*. As in those cases, Shore Transit's restrictions impose undefined prohibitions on speech while failing to provide any written guidance for judging what is permitted and what is prohibited. As a result, Shore Transit's

policy affords enforcement officials virtually unfettered discretion to censor speech according to their own whims and prejudices, creating an intolerable risk of arbitrary or selective enforcement.

This risk is not hypothetical. The Tri-County Council's response to PETA's public records request identifies only two types of advertisements that have been rejected by Shore Transit. The first are advertisements for medical marijuana and CBD products, which were rejected in part because Shore Transit's director believed that they could be perceived as "supporting a position opposed to [the Federal Transit Administration]." Cockey Decl., Exh. E at 19. The second are the PETA advertisements at issue here. Mr. Bellacicco's email to the other Tri-County Commission members indicates that PETA's proposed advertisements were rejected because of "the COVID situation unfolding in the area poultry plants." Cockey Decl, Exh. C at 3. In other words, when Shore Transit told PETA that its advertisements were "too offensive for [its] market and political in nature," Vazquez Decl., Exh. A, it meant that the advertisements highlighted the discomforting fact that the Eastern Shore's poultry plants have contributed to the spread of COVID-19. *See, e.g.*, Scott Dance, *Coronavirus Has Killed 5 Poultry Plant Workers and Infected More Than 200 Other Employees on Maryland's Eastern Shore*, Balt. Sun, (Jun. 12, 2020, 1:05 PM), https://bit.ly/3rOSYAN. It thus appears that Shore Transit is enforcing its advertising restrictions to appease its partners in the federal government and the local business community, at the expense of dissenting viewpoints.

### B.  Shore Transit's Advertising Policy Is Viewpoint Discriminatory.

Shore Transit's ban on advertisements that it deems "controversial, offensive, objectionable or in poor taste" is also impermissibly viewpoint based.

"Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora." *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290, 296 (3d Cir. 2011) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) and *Perry*

*Educ. Ass'n.*, 460 U.S. at 46). Viewpoint discrimination occurs when the government "suppress[es] expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46. "Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not." *Id.* at 61.

As the Supreme Court recently held in *Matal*, restrictions on speech that the government deems "offensive" are viewpoint discriminatory because "[g]iving offense is a viewpoint." 137 S. Ct. at 1763 (opinion of Alito, J) (holding that the Lanham Act's nondisparagement clause is facially viewpoint discriminatory); *see also Iancu*, 139 S. Ct. at 2299 (same for Lanham Act's prohibition on "immoral" and "scandalous" trademarks). As Justice Kennedy warned in his *Matal* concurrence, "a speech burden based on audience reactions is simply *government* hostility and intervention in a different guise." 137 S. Ct. at 1767 (Kennedy, J., concurring in part and concurring in the judgment) (emphasis added). "The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message. And it is the government itself that is attempting in this case to decide whether the relevant audience would find the speech offensive." *Id.*

That is precisely what Shore Transit's policy does here. Shore Transit is rejecting advertisements based on apprehensions that these advertisements could be perceived as opposing the interests and positions of the meatpacking industry and the Federal Transit Administration. Such viewpoint-based restrictions are unconstitutional, even in a nonpublic forum. *See Perry Educ. Ass'n*, 460 U.S. at 61–62; *see also, e.g.*, *Planned Parenthood v. Chi. Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is ʻcontroversialʼ could ever pass constitutional muster." (citations omitted)); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87

(1st Cir. 2004) (transit agency's rejection of marijuana advertisement was unconstitutional, even in a non-public forum, in part because of officials' improper motive).

### C. Shore Transit's Policy Is Unconstitutionally Vague.

Shore Transit's policy also violates the Fourteenth Amendment's Due Process Clause because it is unconstitutionally vague. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what [speech] it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chi. v. Morales*, 527 U.S. 41, 56–57 (1999)); *accord Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 370–71 (4th Cir. 2012). An unconstitutionally vague statute or regulation "fails to give adequate warning of what activities it proscribes or fails to set out ‵explicit standards′ for those who must apply it." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–14 (1972)). "[T]he requirement that a legislature establish minimal guidelines to govern law enforcement" is "perhaps the most meaningful aspect of the vagueness doctrine." *Smith v. Goguen*, 415 U.S. 566, 574 (1974).

For all the reasons articulated in Section I.A. *supra*, Shore Transit's policy of prohibiting advertisements that are "political," "controversial," "offensive," "objectionable," or "in poor taste" is unconstitutionally vague because it fails to provide an advertiser a reasonable opportunity to understand what it prohibits and because it confers unbridled discretion on Shore Transit's enforcement officials. *See White Coat Waste Project*, 463 F. Supp. 3d at 708–10 (holding that a public transit system's restriction on "political ads" was unconstitutionally vague as applied to White Coat Waste Project, whose advertisement was barred because the system's communications

director determined White Coat Waste Project to be an "animal cruelty related nonprofit" and, therefore, "a political action group").

## II. PETA's Ongoing Loss of First Amendment Freedoms Constitutes "Irreparable Injury" Warranting a Preliminary Injunction.

In a First Amendment case, a plaintiff who establishes a likelihood of success on the merits presumptively establishes irreparable harm as well. *W.V. Ass'n of Club Owners*, 553 F.3d at 298. This is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, PETA's loss of access to Shore Transit's advertising space constitutes irreparable harm for which no adequate remedy exists at law. A preliminary injunction is necessary to remedy this injury to PETA's First Amendment rights.

## III. An Injunction Will Not Harm Shore Transit Nor Impair the Public Interest.

PETA's likelihood of success on the merits also tips the third and fourth preliminary injunction factors in its favor. Defendants would be "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing a regulation, which, on this record, is likely to be found unconstitutional." *Albemarle Cty. Sch. Bd.*, 354 F.3d at 261. And "upholding constitutional rights serves the public interest." *Id.* In particular, the public has a strong interest in being able to access Shore Transit's advertising space free from the constraints of an advertising policy that violates both the Free Speech Clause (as incapable of reasoned application and viewpoint discriminatory) and the Due Process Clause (as void for vagueness).

## IV. The Court Should Waive the Bond Requirement.

Typically, a party seeking a preliminary injunction is required to post a bond sufficient to cover the damages inflicted on a party found to have been wrongly enjoined. Fed. R. Civ. P. 65(c).

However, the district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (collecting cases); *see also Md. Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) ("[The District Court has] discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm."). Because Defendants would suffer no damages as a result of the preliminary injunction requested by PETA, and because the balance of harms strongly favors PETA, the Court should waive the bond requirement.

## CONCLUSION

For all the reasons set forth above, Shore Transit's policy of rejecting advertisements that it deems to be "political," "offensive," "controversial," "objectionable," or "in poor taste" violates the First and Fourteenth Amendments, both facially and as applied to PETA. Because all four of the preliminary injunction factors favor PETA, the Court should enter a preliminary injunction prohibiting Defendants from enforcing Shore Transit's unconstitutional advertising policy and issue an order requiring Defendants to provide advertising space to PETA on equal terms to other advertisers.

| August 16, 2021 | Respectfully submitted, |
|---|---|
| Brian M. Hauss* <br> American Civil Liberties <br>   Union Foundation <br> 125 Broad Street, 18th Floor <br> New York, NY 10004 <br> T: 212.549.2500 <br> F: 212.549.2654 <br> bhauss@aclu.org | /s/ <br> Robin R. Cockey, Federal Bar No. 02657 <br> Cockey, Brennan & Maloney, PC <br> 313 Lemmon Hill Lane <br> Salisbury, MD 21801 <br> T: 410.546.1750 <br> F: 410.546.1811 <br> rrcesq@cbmlawfirm.com |
| * *pro hac vice* application forthcoming | *Counsel for Plaintiff* |