# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.
     501 Front Street
     Norfolk, VA 23510
              *Plaintiff*,

v.

SHORE TRANSIT
     31901 Tri-County Way, Suite 133
     Salisbury, MD 21804

BRAD BELLACICCO, in his official
capacity as the Director of Shore Transit
     31901 Tri-County Way, Suite 133
     Salisbury, MD 21804

TRI-COUNTY COUNCIL OF THE
LOWER EASTERN SHORE OF
MARYLAND
     31901 Tri-County Way, Suite 201,
     Salisbury, MD 21804
             *Defendants*.

Civil Action No. 1:21-cv-02083-JKB

**PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................3

I.    The Court Should Grant PETA's Motion for Preliminary Injunction. ...........................3

    A.    PETA Is Likely to Succeed on Its First and Fourteenth Amendment Claims. .........4

        i.    Shore Transit's Policy Is Incapable of Reasoned Application.........................4

        ii.    Shore Transit's Policy Is Viewpoint Discriminatory. ....................................10

        iii.  Shore Transit's Policy Is Unconstitutionally Vague. ....................................15

    B.    The Other Preliminary Injunction Factors Favor PETA.......................................16

II.    The Court Should Deny Defendants' Motion to Dismiss. .............................................18

    A.    PETA Has Plausibly Alleged That Shore Transit's Policy Is Incapable of Reasoned Application, Viewpoint Discriminatory, and Unconstitutionally Vague. ...................................................................................................................19

    B.    PETA Has Plausibly Alleged That Shore Transit's Policy Is Substantially Overbroad..................................................................................................................20

    C.    PETA Has Plausibly Alleged That Shore Transit's Policy Is an Impermissible Content-Based Restriction in a Designated Public Forum. ............22

CONCLUSION..................................................................................................................23

## INTRODUCTION

Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") has filed a motion for preliminary injunction against Shore Transit's policy restricting advertisements that Shore Transit deems "political," "controversial," "offensive," "objectionable," or "in poor taste." ECF 7.  As PETA argued in its supporting memorandum, ECF 7-1, Shore Transit's policy violates the First and Fourteenth Amendments— both facially and as applied to PETA— for three independent reasons, any one of which would justify a preliminary injunction.

First, Shore Transit's policy is incapable of reasoned application because the policy's undefined restrictions do not provide objective, workable standards to guide the discretion of enforcement officials. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018). Applying *Mansky*, numerous courts have held that advertising policies similar to the one at issue here violate the First Amendment. *See, e.g.*, *Ctr. for Investigative Reporting v. SEPTA*, 975 F.3d 300 (3d Cir. 2020), *cert. denied*, --- S. Ct. ----, 2021 WL 4507651 (Oct. 4, 2021). Attempting to evade *Mansky*, Defendants argue that Shore Transit's policy is permissible under *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974). However, *Lehman* merely established that restrictions on campaign advertisements are permissible in a nonpublic forum. Shore Transit's policy is much broader, and therefore impermissible.

Second, Shore Transit's policy is facially viewpoint discriminatory because it discriminates against viewpoints that Shore Transit deems "controversial, offensive, objectionable or in poor taste." *See Matal v. Tam*, 137 S. Ct. 1744 (2017); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2300 (2019).  Shore Transit does not address the Supreme Court's decisions in *Matal* and *Iancu*. Instead, it relies on a pre-*Matal* Second Circuit precedent that the Second Circuit itself has

repudiated. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 33 n.5 (2d Cir. 2018) (citing *Perry v. Macdonald*, 280 F.3d 159 (2d Cir. 2001)).

Defendants' brief also reveals that Shore Transit has interpreted and applied its policy in a viewpoint discriminatory manner. Defendants argue that Shore Transit justifiably rejected PETA's proposed advertisements because the Tri-County Council for the Lower Eastern Shore (and, by extension, Shore Transit) is statutorily required to discriminate against anti-business perspectives. ECF 24 at 9-10. If the Tri-County Council's organic statute truly required Shore Transit to engage in such blatant viewpoint discrimination, the statute would be unconstitutional. But the statute requires no such thing; it merely stipulates that the Tri-County Council is organized for the purpose of promoting physical, economic, and social development. This Court should not accept Defendants' invitation to interpret the statute in a manner that creates a constitutional conflict. Instead, the Court should hold that Shore Transit's application of its advertising policy to PETA is viewpoint discriminatory.

Third, Shore Transit's policy is unconstitutionally vague for largely the same reasons that it is incapable of reasoned application. The policy's undefined terms do not provide adequate notice to advertisers about what sorts of advertisements will be accepted or rejected, and they invite arbitrary or selective enforcement by Shore Transit's officials. Although Defendants suggest that vagueness doctrine may not apply in this context, several courts have upheld vagueness challenges to public transit systems' advertising policies. Defendants do not identify any reason why this case should be an exception.

Because Shore Transit is likely to succeed on its First and Fourteenth Amendment claims, it has established irreparable harm. Furthermore, both the balance of equities and the public interest support the vindication of constitutional rights against presumptively unlawful government

policies, especially where (as here) the government's predictions of harm are based on unsupported speculation. Although Defendants may be inconvenienced by an injunction requiring Shore Transit to fulfill its constitutional obligations, that is not a harm this Court should recognize.

Finally, Defendants' motion to dismiss should be denied. Even if this Court concludes that the present evidentiary record is insufficient to establish PETA's likelihood of success on the merits, PETA has at least plausibly alleged that Shore Transit's policies are incapable of reasoned application, viewpoint discriminatory, and unconstitutionally vague. Discovery is likely to turn up additional evidence supporting PETA's claims under these theories, especially its as-applied claims. Furthermore, PETA has plausibly alleged that Shore Transit's advertising policy is substantially overbroad because it confers too much discretion on enforcement officials. And PETA has plausibly alleged that Shore Transit's advertising policy is an impermissible content-based restriction on speech in a designated public forum.

Accordingly, the Court should grant PETA's motion for preliminary injunction and deny Defendants' motion to dismiss.

## ARGUMENT

## I.    The Court Should Grant PETA's Motion for Preliminary Injunction.

The Supreme Court has identified four factors that courts must consider in deciding a motion for preliminary injunction: (1) has the movant shown a reasonable probability of success on the merits; (2) will the movant be irreparably harmed by denial of the relief; (3) will granting preliminary relief result in even greater harm to the non-movant; and (4) is granting preliminary relief in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008); *see also, e.g.*, *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). In cases involving the alleged violation of constitutional rights, the latter three factors

usually depend on the movant's likelihood of success on the merits. *See Leaders of a Beautiful Struggle v. Balt. Police Dept.*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). Here, all four *Winter* factors favor PETA.

**A.      PETA Is Likely to Succeed on Its First and Fourteenth Amendment Claims.**

PETA moved for a preliminary injunction on three independent theories: (1) Shore Transit's policy is incapable of reasoned application; (2) Shore Transit's policy is viewpoint discriminatory; and (3) Shore Transit's policy is unconstitutionally vague. Success on any one of these theories would justify a preliminary injunction

**i.      Shore Transit's Policy Is Incapable of Reasoned Application.**

Even in a nonpublic forum, restrictions on speech must be reasonable and viewpoint neutral. *Mansky*, 138 S. Ct. at 1885. As PETA argued in its motion for preliminary injunction, ECF 7-1 at 11–16, Shore Transit's policy is facially deficient because it is incapable of reasoned application. *Mansky* is directly on point. There, the Supreme Court held that a Minnesota statute prohibiting "political" apparel in polling places violated the First Amendment because it failed to provide "objective, workable" standards to guide the discretion of enforcement officials, thereby creating an unacceptable risk that a government official's "own politics may shape his view on what counts as ‘political.'" *Id.* at 1891. The same problem bedevils Shore Transit's policy prohibiting advertisements that Shore Transit deems "political," "controversial," "offensive," "objectionable," or "in poor taste." These undefined terms are "so broad as to provide [the government] with no meaningful constraint upon its exercise of the power to squelch." *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 372 (D.C. Cir. 2018) [hereinafter, *AFDI v. WMATA*].

Defendants argue that *Mansky* is inapplicable to the advertising space on public transit systems, and that this case is instead governed by the Supreme Court's decision in *Lehman*. ECF 24 at 14–21. But *Lehman* is not what Defendants make it out to be. In that case, an Ohio General Assembly candidate sought to place campaign advertisements on the Shaker Heights Rapid Transit System, and was informed that the city transit system did not accept such advertisements on its vehicles. 418 U.S. at 300. Justice Blackmun's plurality opinion stated the question presented as "whether a city which operates a public rapid transit system and sells advertising space for car cards on its vehicles is required by the First and Fourteenth Amendments to accept *paid political advertising on behalf of a candidate for public office*." *Id.* at 299 (emphasis added).

The plurality opinion focused on Lehman's contention that public transit systems' advertising spaces "constitute a public forum protected by the First Amendment, and that there is a guarantee of nondiscriminatory access to such publicly owned and controlled areas of communication ‐‐regardless of the primary purpose for which the area is dedicated." *Id.* at 301. The Court rejected this argument, holding that the Shaker Heights transit system's advertising space, "although incidental to the provision of public transportation, is a part of the commercial venture," and that "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." *Id.* at 303.

At the same time, *Lehman* recognized that, even in a nonpublic forum, "the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious." *Id.* If Shaker Heights opened up the limited advertising space available in its transit system to "short-term" electoral campaign advertisements, the Court reasoned, "[t]here could be lurking doubts about favoritism, and sticky administrative problems might arise in parceling out limited space to eager politicians." *Id.* at 304.

Two points stand out from the plurality's decision. First, in upholding the transit system's restriction on political advertisements, the Court emphasized that the policy of denying "political" content could not be applied in an arbitrary or invidious manner. There was no dispute in *Lehman* that the electoral campaign advertisements were political, nor any suggestion that the prohibition had been inconsistently applied. The Court thus had no occasion to address whether a prohibition on "political" speech, applied far beyond the "paid political advertising on behalf of a candidate for public office" at issue in *Lehman*, *id.* at 299, could be incapable of reasoned application. To similar effect, the Court in *Mansky* reasoned that polling-place restrictions on apparel from other states "relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election" were "more lucid" than Minnesota's unconstitutional restriction on "political" apparel. *Mansky*, 138 S. Ct. at 1891 (citation omitted).

Second, the plurality in *Lehman* did not suggest that public transit systems' advertising spaces are unique. To the contrary, it stated that its decision would have implications for "display cases" in all manner of "public facilities." *Lehman*, 418 U.S. at 304. In other words, *Lehman* did not purport to establish a discrete category of "public transit authority law," analytically distinct from other precedents concerning speech restrictions on government property. Thus, there is no reason that the First Amendment principles that governed in *Mansky* should not apply to public transit advertising spaces.

Read together, *Lehman* and *Mansky* establish that the government proprietors of a nonpublic forum may impose content-based restrictions on campaign speech, but they may not ban "political" speech, or similarly nebulous subjects, without providing sufficiently definite standards to guide the discretion of enforcement officials. For example, in *Zukerman v. United States Postal Service*, the D.C. Circuit held that the U.S. Postal Service's regulation banning

custom postage designs containing "political" content was incapable of reasoned application under *Mansky*. 961 F.3d 431, 447–52 (D.C. Cir. 2020). The court explained that although *Lehman* similarly addressed a ban on "political" speech, the policy it upheld was in fact a "more precise, objective, and workable" restriction against "political advertising on behalf of a candidate for public office," as opposed to the U.S. Postal Service's "*blanket* ban on -political" content." *Id.* at 451; *accord Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Regional Transp.*, 978 F.3d 481, 495 (6th Cir. 2020) [hereinafter, *AFDI v. SMART*] (observing that *Lehman* upheld a ban on "traditional election materials").

As the facts of this case demonstrate, Shore Transit's advertising policy is not limited to the narrow context of campaign advertisements, but rather encompasses speech on all manner of public issues. Like the ban on "political" apparel in *Mansky*, it affords unguided discretion to Shore Transit's officials to determine what advertisements are "political," "controversial," "offensive," "objectionable," or "in poor taste" according to their personal whims and biases. This approach leaves too much room for officials to engage in "arbitrary, capricious, or invidious" enforcement, *Lehman*, 418 U.S. at 303, as demonstrated by Shore Transit's application of the policy here.

While conceding that "PETA's advertisements do not specifically contain an endorsement of a political candidate," Defendants maintain that the advertisements "clearly implicate a political agenda, in that they contain inherently political language." ECF 24 at 18. Turning from tautology to *ipse dixit*, Defendants assert "[t]he advertisements' references to closing slaughterhouses is political in nature, and Shore Transit appropriately rejected PETA's advertisements for this reason." *Id.* In fact, it appears Shore Transit rejected PETA's advertisements because it perceived the advertisements to be anti-business. ECF 24 at 9–10. This is precisely the sort of invidious viewpoint discrimination that the First Amendment prohibits. *See infra* Section I.A.ii.

7

Defendants make two arguments to distinguish *Mansky*, neither of which avails. First, Defendants contend that the statute in *Mansky* was incapable of reasoned application because "Minnesota's attempt at providing guidance resulted in a greater level of uncertainty as to what items the apparel ban applied to." ECF 24 at 17. This argument has been proffered, and rejected, in other cases. "[T]he ill-defined term 'political' was seen by the Court in *Mansky* as a critical problem— a problem that the state's authoritative interpretations could not overcome." *Zukerman*, 961 F.3d at 450. "[F]ar from helping [Defendants'] case, the absence of guidelines cabining [Mr. Bellacicco's] discretion in determining what constitutes a political advertisement actually suggests that, like the Minnesota statute in *Mansky*, the lack of 'objective, workable standards' may allow [Mr. Bellacicco's] 'own politics to shape his views on what counts as 'political.''" *Ctr. for Investigative Reporting*, 975 F.3d at 316 (cleaned up) (quoting *Mansky*, 138 S. Ct. at 1891); *see also AFDI v. SMART*, 978 F.3d at 495 ("SMART cannot rely on any official guidance to create workable standards. Apart from its Advertising Guidelines, SMART has no other sources defining the word 'political' or telling officials how to apply it.").

Second, Defendants argue that *Mansky* is inapposite because it concerned polling places rather that public transit advertising spaces. ECF 24 at 19. It is not immediately apparent why this distinction should affect the reasonableness analysis. The captive audience concerns on which Defendants place so much weight, ECF 24 at 15, were at least as compelling in *Mansky*— where the Court emphasized the government's broad power "to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most." 138 S. Ct. at 1888. "Given the stakes, *Mansky* compellingly illustrates why the government must adopt objective, workable speech restrictions, even in nonpublic forums. But the Court's decision did not turn on the stakes. Instead, the Court's holding turned on the fact that

the challenged rule was not capable of reasoned application; that is the problem here too." *Zukerman*, 961 F.3d at 451.

Nothing in either *Mansky* or *Lehman* supports Defendants' attempt to establish a different set of First Amendment principles for polling places and another set of rules for public transit advertising spaces. To the contrary, the Third and Sixth Circuits have unanimously held that *Mansky* prohibits public transit systems from broadly banning "political advertisements." *See Ctr. for Investigative Reporting*, 975 F.3d at 314–17; *AFDI v. SMART*, 978 F.3d at 485–86. And the Ninth and D.C. Circuits have suggested in dicta that they would reach the same conclusion. *See Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 655 (9th Cir. 2019); *AFDI v. WMATA*, 901 F.3d at 372.

Defendants do not address these post-*Mansky* authorities. Instead, they rely on the Second Circuit's pre-*Mansky* decision in *Lebron v. Nat'l Passenger Corp. (Amtrak)*, 69 F.3d 650 (2d Cir. 1995), *opinion amended upon denial of rh'g*, 89 F.3d 39 (2d Cir. 1995). There, the Second Circuit upheld "Amtrak's policy of excluding noncommercial advertisements from the Spectacular," *id.* at 656, "a curved back-lit display space approximately 103 feet wide by ten feet high . . . [which] dominates the west wall of the rotunda on the upper level of Penn Station where thousands of passengers pass each day," *id.* at 653 (alterations in original) (citation omitted).

Although Amtrak's restriction on noncommercial advertisements may have been motivated in part by its desire to refrain from "enter[ing] the political arena," the Second Circuit upheld the policy because "Amtrak's prior written agreements . . . and [its] historic practice of reserving the Spectacular for commercial advertisements, dispel[led] the notion that Amtrak enjoyed ‗unbridled discretion' or could have perpetrated an ‗illegitimate abuse of censorial power' in rejecting an advertisement because of its political content." *Id.* at 658. The court also noted that

if the "policy were used to screen out only controversial political advertisements" that is, political advertisements distasteful to the majority" it would be void for viewpoint bias." *Id.* Shore Transit's policy, on the other hand, bans any advertisement that Shore Transit deems "political," "controversial," "offensive," "objectionable," or "in poor taste," regardless of whether the advertisement is commercial or noncommercial. Indeed, the policy is not only facially viewpoint discriminatory, it is also being applied to restrict anti-business viewpoints because Shore Transit deems them "too offensive for [its] market." *See infra* Section I.A.ii.

Even if *Lebron* could be interpreted to permit an undefined restriction on "political" speech in a nonpublic forum, that holding: (i) would not be binding on this Court; and (ii) would have been abrogated by *Mansky*. As the Sixth Circuit recognized in *AFDI v. SMART*, pre-*Mansky* decisions that "interpreted the Supreme Court's prior cases about nonpublic forums as allowing the government to draw 'fine lines' on a case-by-case basis" are of limited relevance, because "*Mansky* now clarifies that this reasonableness requirement for nonpublic forums has greater teeth and compels states to adopt 'a more discernible approach.'" 978 F.3d at 497 (quoting *Mansky*, 138 S. Ct. at 1891) (holding on appeal from a decision on summary judgment that a public transit agency's restriction on "political" advertisements was incapable of reasoned application, after upholding the policy on appeal from a preliminary injunction decision). Shore Transit's policy does not satisfy *Mansky's* more stringent reasonableness standard.

### ii.      Shore Transit's Policy Is Viewpoint Discriminatory.

As set forth in PETA's memorandum supporting its motion for preliminary injunction, Shore Transit's ban on advertisements that it deems "controversial, offensive, objectionable or in poor taste" is facially viewpoint discriminatory. ECF 7-1 at 16-18. In *Matal*, the Supreme Court held that restrictions on speech that the government deems "offensive" are viewpoint

discriminatory because "[g]iving offense is a viewpoint." 137 S. Ct. at 1763 (holding that the

Lanham Act's prohibition against disparaging trademarks was facially viewpoint discriminatory);

*see also id.* at 1766 (Kennedy, J., concurring in part and concurring in the judgment) ("The law

thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the

essence of viewpoint discrimination."). Similar terms used to distinguish between viewpoints

"inducing societal nods of approval and those provoking offense and condemnation" suffer from

the same fundamental flaw. *See Iancu*, 139 S. Ct. at 2300 (holding that the Lanham Act's

prohibition against "immoral or scandalous" trademarks was facially viewpoint discriminatory).

Defendants do not address these precedents. Instead, they argue that, "in certain situations,

courts have held that policies limiting First Amendment activity on the basis that the expression is

'offensive' are constitutionally permissible." ECF 24 at 23. The only case that Defendants cite in

support of this proposition is *Perry v. Macdonald*. There, the Second Circuit held (in relevant part)

that "Vermont's prohibition on the use of automobile license plates bearing scatological terms that

might be deemed offensive or confusing by the general public [was] reasonable and viewpoint

neutral." 280 F.3d at 175; *see id.* at 169–73.

*Perry* is no longer good law, even in the Second Circuit. In *Wandering Dago*, the court

held that New York engaged in impermissible viewpoint discrimination when it denied a food

vendor's application to participate in a government-sponsored program because the vendor's name

contained an ethnic slur. *See* 879 F.3d at 24. In light of *Matal's* holding that government

restrictions on "offensive" speech are viewpoint discriminatory, the Second Circuit found it

"unnecessary to discuss at length earlier precedents that could be interpreted as supporting a

different conclusion," including in particular its decision in *Perry. Id.* at 33 & n.5 (citing *Perry*,

280 F.3d at 170–71). Although *Matal* abrogated *Perry's* viewpoint discrimination holding, the

Second Circuit court noted that Vermont's restriction on offensive license plates "might now be permitted on the alternative ground that the [vanity] plate's language constituted government speech." *Id.* at 33 n.5 (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015)).[1]

Defendants alternatively argue that the constitutionality of Shore Transit's viewpoint discriminatory policy must be "analyzed in the context of the forum in which it occurs." ECF 24 at 24. The forum analysis accounts for context by distinguishing traditional and designated public forums (where content discrimination is prohibited) from nonpublic forums (where content discrimination is acceptable). *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995). Defendants have "identifie[d] no case suggesting that the meaning of ‹viewpoint discrimination› can change depending on the context in which it is used." *AFDI v. SMART*, 978 F.3d at 501. To the contrary, "*Matal*'s reasoning about what qualifies as ‹viewpoint› discrimination . . . has relevance . . . whether or not it addressed a nonpublic forum." *Id.*

Applying *Matal*, at least two circuits have already recognized that the First Amendment prohibits public transit systems from banning speech they deem controversial or offensive. *See*

---

[1] In *Walker*, the Supreme Court distinguished vanity license plates (government speech) from private advertising spaces on city buses (not government speech) on the ground that advertising space "is traditionally available for private speech" and generally bears "no indicia that the speech [is] owned or conveyed by the government." 576 U.S. at 218. Consistent with this authority, Defendants have not argued that Shore Transit's advertising space is government speech. Indeed, they affirmatively argue that "[t]he advertising space on Shore Transit's buses clearly constitutes a nonpublic forum." ECF 24 at 12. In a footnote, however, Defendants suggest that "the public could view the advertisements on Shore Transit's vehicles as being endorsed by Shore Transit" because "a portion of Shore Transit's vehicles contain no advertisements and may contain public service announcements." *Id.* at 24 n.4. Defendants cite no authority for the proposition that private advertising space should be considered government speech simply because it may be used by government speakers. They also do not substantiate their dubious assertion that there is "a substantial risk" the public will attribute private advertisements to the government. If such a risk existed, Shore Transit could easily address it by posting its own disclaimers.

*id.* at 500; *Am. Freedom Defense Initiative v. King Cty.*, 904 F.3d 1126, 1132 (9th Cir. 2018); *see also Planned Parenthood v. Chi. Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass constitutional muster." (citations omitted)). Even *Lebron*, upon which Defendants rely so heavily, acknowledged that a government policy restricting "controversial political advertisements" that is, political advertisements distasteful to the majority . . . would be void for viewpoint bias." 69 F.3d at 658.

As Justice Kennedy explained in his *Matal* concurrence, "a speech burden based on audience reactions is simply government hostility and intervention in a different guise." 137 S. Ct. at 1767. This case is a good example. Defendants argue that Shore Transit restricts "political" and "offensive" advertisements to protect the sensibilities of Shore Transit's riders. ECF 24 at 24–26. But Shore Transit has apparently interpreted its policy to ban advertisements that "suggest businesses within the region should be closed," ECF 24 at 10. Defendants further assert, without evidence or explanation, that advertisements referencing what in fact takes place at a slaughterhouse— including any use of the word "kill" or even stylized depictions of blood— are inherently offensive. *Id.* at 25; *cf. Matal*, 137 S. Ct. at 1765 (condemning the Lanham Act's disparagement provision as a "happy-talk clause"). This is textbook viewpoint discrimination against a perspective that Defendants themselves consider inflammatory. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (holding that a flag desecration statute was viewpoint discriminatory as applied to flag burning).

Defendants attempt to justify this unconstitutional policy on statutory grounds. They jump from the premise that the Tri-County Council was created for the purpose of "foster[ing] the physical, economic, and social development of the region," Maryland Code, Economic

13

Development (õEDö) § 13-802(c)(2)(i), to the conclusion that they are authorized and required to reject advertisements advocating the closure of local businesses. ECF 24 at 9ó10. If the Tri-County Counciløs organic statute truly required such blatant viewpoint discrimination, it would violate the First Amendment, and Defendants would have to be enjoined from enforcing it. *See Ex parte Young*, 209 U.S. 123 (1908). But the Court need not accept Defendantsø invitation to create a constitutional conflict where none is apparent from the statutory text. *See Harrison-Solomon v. State*, 442 Md. 254, 287, 112 A.3d 408, 428 (2015) (õWe do not presume that the Legislature intended to enact unconstitutional legislation and, if it did so intend, we would limit a statute to only those situations in which it would pass constitutional muster.ö). Defendants have simply overread their statutory mandate.

Furthermore, Defendantsø argument belies their assertion that Shore Transitøs õdenial was focused on the offensive aspects of the content of PETAøs proposed advertisements and not any viewpoint expressed therein.ö ECF 24 at 25ó26. Putting aside the fact that giving offense is itself a viewpoint under *Matal* and *Brunetti*, Defendants effectively concede that they have applied the challenged policy to reject PETAøs advertisement because it advocates the closure of slaughterhouses. That concession alone is sufficient for PETA to prevail on its as-applied First Amendment claim. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 485 (2014) (acknowledging that a facially neutral law would be subject to an as-applied First Amendment challenge if it were enforced in a viewpoint discriminatory manner).

Accordingly, the Court should hold that the challenged is both facially viewpoint discriminatory (because it expressly prohibits advertisements that Shore Transit deems õoffensive, controversial, objectionable, or in poor tasteö) and viewpoint discriminatory as applied to PETA

(because Defendants have interpreted the policy to prohibit PETA's viewpoint that local slaughterhouses should be closed).

### iii.     Shore Transit's Policy Is Unconstitutionally Vague.

As PETA argued in its opening brief, ECF 7-1 at 18, Shore Transit's policy is unconstitutionally vague because it fails to provide an advertiser a reasonable opportunity to understand what it prohibits and because it confers unbridled discretion on Shore Transit's enforcement officials. *See, e.g.*, *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 370–71 (4th Cir. 2012) (describing the contours of the vagueness analysis).

Defendants suggest that "[i]t is not entirely clear that the vagueness doctrine applies to [the] Guidelines, which do not, of course, impose criminal penalties on those whose advertisements are denied." ECF 24 at 26 (first alteration in original) (quoting *AFDI v. WMATA*, 901 F.3d at 372). To the contrary, the Fourth Circuit has applied the vagueness doctrine to various noncriminal regulations. *See Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013) (school dress codes); *Wag More Dogs*, 680 F.3d at 370–72 (sign ordinances). And numerous courts, including courts in this circuit, have held that public transit advertising policies similar to Shore Transit's are unconstitutionally vague. *See White Coat Waste Proj. v. Greater Richmond Transit Co.*, 463 F. Supp. 3d 661, 708 (E.D. Va. 2020) [hereinafter, *White Coat Waste Project II*]; *see also United Food & Comm. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358–60 (6th Cir. 1998); *Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth.*, 112 F. Supp. 2d 1320, 1327–28 (N.D. Ga. 2000).

Although vague restrictions on access to advertising space may not *penalize* prospective advertisers without notice, they nonetheless require prospective advertisers to waste valuable time and resources attempting to predict what Shore Transit's officials will deem acceptable. More

importantly, vague advertising policies invite arbitrary or invidious enforcement, as demonstrated by Defendants' acknowledged discrimination against anti-business viewpoints. *See Smith v. Goguen*, 415 U.S. 566,  574 (1974) ("[P]erhaps the most meaningful aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement.").

Because Shore Transit's policy is incapable of reasoned application, it is also unconstitutionally vague. *See AFDI v. WMATA*, 901 F.3d at 372 (noting the overlap between the two doctrines). However, even if the Court were to conclude that Shore Transit's policy satisfies the First Amendment, the policy would still at least be unconstitutionally vague as applied to PETA. That is because "[t]he record demonstrates that a person of ordinary intelligence could not consistently apply the ban . . . deciding to accept or reject [PETA's] advertisement. Nor could one anticipate what is prohibited. No person of ordinarily intelligence could know ―what falls within, or may fall within‖ one of the prohibited categories such as the ban on political advertising." *White Coat Waste Project II*, 463 F. Supp. 3d at 708 (citation omitted) (upholding an as-applied vagueness challenge while rejecting a facial First Amendment challenge).

**B.     The Other Preliminary Injunction Factors Favor PETA.**

PETA also satisfies the remaining *Winter* factors. Defendants do not dispute that "the irreparable harm factor is satisfied" when "there is a likely constitutional violation." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. Because PETA is likely to succeed on its First and Fourteenth Amendment claims, it has established irreparable harm.

"Likewise, the balance of the equities favors preliminary relief because . . . a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Id.* at 346 (internal quotation marks omitted)

(quoting *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013)). Furthermore, "it is well-established that the public interest favors protecting constitutional rights." *Id.*

Defendants argue that the balance of equities and public interest disfavor injunctive relief because "Shore Transit will be inherently limited in the categories of advertisements it will be permitted to reject" if its unconstitutional policy is enjoined. ECF 24 at 31. Defendants speculate that any restriction on Shore Transit's boundless discretion to reject advertisements will give rise to a flood of advertisements so offensive that riders will stop using Shore Transit's services and advertisers will abandon Shore Transit's advertising spaces. *Id.* at 31–33. Defendants do not provide any evidence to support their dire predictions. *Cf. NAACP v. City of Phila.*, 834 F.3d 435, 446 (3d Cir. 2016) (stating that "Supreme Court guidance cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders [a] ban [on advertisements in a nonpublic forum] constitutional" because "this objective is nebulous and not susceptible to objective verification").

PETA has already submitted contradictory evidence. Although Shore Transit accepted 87 advertisements in 2020 alone, it appears that only two types of advertisements have ever been rejected: advertisements for medical marijuana and cannabidiol (CBD) products and the advertisements at issue here. *See* ECF 7-1 at 5–6. It is hard to believe that these advertisements would cause a mass exodus from Shore Transit's system. But even if Defendants' fears were well-founded, nothing prevents Shore Transit from adopting an advertising policy that complies with its constitutional obligations. Assuming for purposes of PETA's preliminary injunction motion that Shore Transit's advertising space is a nonpublic forum, Shore Transit may comply with its constitutional obligations by adopting viewpoint-neutral guidelines that include objective, workable standards for enforcement. *See Ctr. for Investigative Reporting*, 975 F.3d at 317 n.5.

17

While Shore Transit may find the constitutional limits on its discretion inconvenient, that is not a harm this Court should countenance.

## II.     The Court Should Deny Defendants' Motion to Dismiss.

The Court should also deny Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). ECF 23. In ruling on a motion to dismiss under Rule 12(b)(6), the court must accept as true all of the factual allegations in the complaint and view those facts in the light most favorable to the plaintiff. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Rather, "[t]he purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To plausibly state a claim, "[t]he complaint must present enough facts to raise a reasonable expectation that discovery will reveal evidence of the alleged [unlawful] activity." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017) (internal quotation marks omitted) (quoting *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010)).

Shore Transit's motion to dismiss should be denied because PETA has at least plausibly alleged that Shore Transit's policy is incapable of reasoned application, viewpoint discriminatory, and unconstitutionally vague. Even if the Court disagrees that PETA has stated a claim under those theories, however, PETA has also plausibly alleged that Shore Transit's policy is substantially overbroad and that it constitutes an impermissible content-based restriction on speech in a

designated public forum. If PETA has stated a claim under any one of these theories, Shore

Transit's motion to dismiss must be denied.[2]

A.     **PETA Has Plausibly Alleged That Shore Transit's Policy Is Incapable of Reasoned Application, Viewpoint Discriminatory, and Unconstitutionally Vague.**

As discussed in Section I.A, PETA is likely to succeed on its First and Fourteenth

Amendment claims because Shore Transit's advertising policy is incapable of reasoned

application, viewpoint discriminatory, and unconstitutionally vague. However, even if this Court

were to conclude that the present evidentiary record does not support a preliminary injunction,

dismissal of PETA's claims prior to discovery would be inappropriate, particularly with respect to

PETA's as-applied First and Fourteenth claims. *See White Coat Waste Project v. Greater*

*Richmond Transit Co.*, No. 3:17cv719, 2018 WL, 2018 WL 4610089 (E.D. Va. Sept. 25, 2018)

[hereinafter, *White Coat Waste Project I*] (holding that the plaintiff stated First and Fourteenth

Amendment claims where the complaint alleged that the defendant's advertising policy did not

include adequate safeguards to prevent arbitrary and viewpoint discriminatory enforcement).

Defendants assert that "[t]here is no risk that [Shore Transit's] policy will be applied in an

erratic manner, and there is no indication that Shore Transit has previously accepted political

advertisements or advertisements like those proposed by PETA on its vehicles." ECF 24 at 22. But

PETA has not received copies of the advertisements that have been accepted by Shore Transit, nor

has PETA had the opportunity to propound interrogatories or conduct depositions regarding Shore

Transit's interpretation and application of its advertising policy. In similar cases, the evidence

produced through discovery on these issues has informed the constitutional analysis. *See AFDI v.*

---

[2] If the Court concludes that the complaint fails to state a claim, PETA respectfully requests leave to amend the complaint in order to address any curable deficiencies.

*WMATA*, 978 F.3d at 495; *Ctr. for Investigative Reporting*, 975 F.3d at 316‚617; *White Coat Waste Project II*, 463 F. Supp. 3d at 700‚602, 708‚610. Pre-discovery dismissal in this case would be inappropriate.[3]

**B.   PETA Has Plausibly Alleged That Shore Transit's Policy Is Substantially Overbroad.**

PETA has also plausibly alleged two additional grounds for its facial First Amendment claim. First, PETA has plausibly alleged that Shore Transit's policy is substantially overbroad. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation and internal quotation marks omitted). "The party challenging the law need not necessarily introduce admissible evidence of overbreadth, but generally must at least ‑describe the instances of arguable overbreadth of the contested law." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (en banc) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

Shore Transit's advertising policy is substantially overbroad because it "delegate[s] standardless discretionary power to local functionaries." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (collecting cases). The Sixth Circuit's decision in *United Food* instructive. There, the court held that a public transit system's restriction on "controversial ads that adversely affect [the system's] ridership," 163 F.3d at 360, was substantially overbroad because "it unquestionably

_____

[3] As noted in PETA's motion for preliminary injunction, ECF 7-1 at 4, PETA filed a Maryland Public Information Act request with the Tri-County Council for records relating to Shore Transit's advertising policy. Those records are attached to the Declaration of Robin R. Cockey, ECF 7-8 through 7-13. PETA did not press its public records request for copies of advertisements that have been accepted by Shore Transit over the past three years because of the additional costs required to obtain those documents through the public records process.

allow[ed] for viewpoint discrimination," *id.* at 361. The court emphasized that "[t]he danger is very real and substantial that [the transit system's] rejection of a proposed advertisement due to the controversy generated by its message will have —a speech-based restriction as its sole rationale and operative principle." *Id.* at 362 (quoting *Rosenberger*, 515 U.S. at 834); *see also Nat'l Abortion Fed'n*, 112 F. Supp. 2d at 1328 (suggesting without deciding that a transit system's restriction on advertisements taking a position on matters of public controversy was substantially overbroad, as well as vague). Shore Transit's advertising policy is considerably broader than the policy in *United Food*, and the danger that it will be applied in a viewpoint discriminatory manner has already been realized.

Citing the Second Circuit's decision in *Lebron*, Defendants argue that the overbreadth doctrine applies only when the government acts "as a regulat[or], not as a proprietor." ECF 23-1 at 29 (citing *Lebron*, 651 F.3d at 659). Defendants misconstrue *Lebron's* holding. The Second Circuit held that, because Amtrak's advertising policy was constitutional with respect to Lebron, he lacked third-party standing under the overbreadth doctrine to challenge the advertising policy's application in other contexts. *See id.* at 659–660. Here, PETA maintains that Shore Transit's advertising policy was unconstitutionally applied to block PETA's own advertisements, as well as the advertisements of others. *See RAV v. City of St. Paul*, 505 U.S. 377, 381 n.3 (1992) (distinguishing between "technical" overbreadth claims, which are a form of third-party standing, and overbreadth "in the sense of restricting more speech than the Constitution permits, even in its application to" the plaintiff). Because PETA does not invoke third-party standing, *Lebron* is inapposite.

**C.      PETA Has Plausibly Alleged That Shore Transit's Policy Is an Impermissible Content-Based Restriction in a Designated Public Forum.**

Second, PETA has plausibly alleged that Shore Transit's policy violates the First Amendment because it imposes a content-based restriction in a designated public forum. A "designated public forum" is government-owned property that does not qualify as a "traditional" public forum (e.g., city streets or parks), but which the government has intentionally "opened for expressive activity to the public." *Goulart v. Meadows*, 345 F.3d 239, 249 (4th Cir. 2003) (citing *Warren v. Fairfax Cty.*, 196 F.3d 186 (4th Cir. 1999) (en banc)). Content-based restrictions on speech in a "designated public forum" are analyzed under strict scrutiny. *See e.g., Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009). Defendants do not dispute that Shore Transit's advertising policy is at least content based, nor do they argue that the challenged provisions would survive strict scrutiny. The question thus boils down to whether PETA has plausibly alleged that Shore Transit's advertising space is a designated public forum.

In determining whether the government has created a designated public forum, courts look to the government's policies and practice, as well as the government's intent. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985). In many cases, the inquiry into a forum's status "raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988); *accord Air Line Pilots Ass'n, Int'l v. Department of Aviation*, 45 F.3d 1144, 1152 (7th Cir. 1995); *NAACP v. City of Philadelphia*, Civil Action No. 11–6533, 2013 WL 2182704 (E.D. Pa. May 20, 2013). This is one of those cases.

PETA has alleged sufficient facts to survive Defendants' motion to dismiss. The complaint alleges that Shore Transit broadly solicits advertisers "to speak directly to transit riders with [ ] external traveling billboards" so that they can "communicate with families and professionals in their vehicles, people walking or shopping and tourists finding their way on the Lower Eastern

Shore of Maryland." ECF 1 ¶ 19. It alleges that Shore Transit operates the advertising spaces for the purpose of raising revenue. *Id.* ¶ 42; *see Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242, 251 (3d Cir. 1998) ("The goal of generating income by leasing ad space suggests that the forum may be open to those who pay the requisite fee."). And it alleges that Shore Transit has rejected only two types of advertisements: advertisements for medical marijuana and CBD products and the advertisements at issue here. ECF 1 ¶ 28; *see Christ's Bride*, 148 F.3d at 251–52 (noting in designated public forum analysis that "at least 99% of all advertisements are posted without objection by SEPTA").

The mere fact that Shore Transit has imposed some restrictions on access to its advertising spaces— many of which are either incapable of reasoned application or viewpoint discriminatory— is insufficient to establish as a matter of law that it has converted a designed public forum into a nonpublic forum. If it were, strict scrutiny would never apply to content-based restrictions on speech in a designated public forum, because any such restrictions would automatically close the forum. *See N.Y. Magazine v. MTA*, 136 F.3d 123, 129–30 (2d Cir. 1998); *see also Christ's Bride*, 148 F.3d at 256 ("[W]e reiterate that the government's exercise of some restrictions on speech does not foreclose a public forum."). PETA's allegations are therefore sufficient to support a plausible inference that Shore Transit's advertising space is a designated public forum.

## CONCLUSION

PETA's motion for preliminary injunction should be granted because: (i) PETA is likely to succeed in demonstrating that Shore Transit's advertising policy is incapable of reasoned application, viewpoint discriminatory, and unconstitutionally vague; (ii) PETA is being irreparably harmed by the violation of its constitutional rights; and (iii) the balance of equities and the public

interest support the vindication of  constitutional rights, especially where the government's claimed harms are entirely speculative.

Defendants' motion to dismiss should be denied because PETA has plausibly alleged that Shore Transit's advertising policy is: (i) incapable of reasoned application, viewpoint discriminatory, and unconstitutionally vague; (ii) substantially overbroad; and (iii) an impermissible content-based restriction on speech in a designated public forum.

Dated: October 8, 2021                                Respectfully submitted,

        /s/                                                    /s/
_____            _____
Brian Hauss, Federal Bar No. 816251*        Robin R. Cockey, Federal Bar No. 02657
American Civil Liberties                            Cockey, Brennan & Maloney, PC
Union Foundation                                     313 Lemmon Hill Lane
125 Broad Street, 18th Floor                      Salisbury, MD 21801
New York, NY 10004                               T: 410.546.1750
T: 212.549.2500                                      F: 410.546.1811
F: 212.549.2654                                       rrcesq@cbmlawfirm.com
bhauss@aclu.org

* *Pro hac vice*                                       *Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 8th day of October, 2021, I electronically filed the foregoing Plaintiff's Combined Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss with the clerk of the Court by using the CM/ECF system, and via the Court's CM/ECF system on all counsel of record.

_____/s/_____

Robin R. Cockey, Federal Bar No. 02657

Cockey, Brennan & Maloney, PC

313 Lemmon Hill Lane

Salisbury, MD 21801

T: 410.546.1750

F: 410.546.1811

rrcesq@cbmlawfirm.com

*Counsel for Plaintiff*
