## IN THE UNITED STATES DISTRIC COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. | * | |
| | * | |
| Plaintiff | * | CIVIL NO.: 1:21-cv-02083-JKB |
| v. | * | |
| SHORE TRANSIT, et al. | * | |
| | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

DEFENDANTS SHORE TRANSIT, BRAD BELLACICCO and TRI-COUNTY COUNCIL OF THE LOWER EASTERN SHORE OF MARYLAND (hereinafter referred to as the "Council" and collectively referred to as "Shore Transit"), by KARPINSKI, CORNBROOKS & KARP, P.A. and KEVIN KARPINSKI, its attorneys, hereby submit the instant Reply to Plaintiff's Opposition to their Motion to Dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and further state:

### TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................2

**ARGUMENT** .........................................................................................3

**I.  THE ADVERTISING SPACE IN SHORE TRANSIT'S VEHICLES CONSTITUTE A NONPUBLIC FORUM.** ...................................................3

**II. SHORE TRANSIT'S POLICY OF PROHIBITING POLITICAL ADVERTISEMENTS IS PERMISSIBLE AND REASONABLE UNDER *LEHMAN.*** ...........................................................................5

III. *MANSKY* IS DISTINGUISHABLE. ....................................................... 10

IV. SHORE TRANSITS PROHIBITION OF OFFENSIVE AND CONTROVERSIAL
    ADVERTISEMENTS IS CONSTITUTIONAL. .......................................... 14

V. SHORE TRANSIT'S POLICIES ARE NOT UNCONSTITUIONALLY
   OVERBROAD OR VAGUE. ................................................................... 20

CONCLUSION ..................................................................................... 25

## INTRODUCTION

This case arises out of Shore Transit's denial of Plaintiff, People for the Ethical Treatment of Animals, Inc. ("PETA"), request to place advertisements in the vehicles that Shore Transit operates.  Under a contract (the "Contract") with Vector Media Transit, LLC ("Vector"), which is responsible for managing the advertising space on Shore Transit's vehicles, Shore Transit is prohibited from placing certain advertisements on its vehicles including, political advertisements, and those deemed "controversial, offensive, objectionable, or in poor taste."  ECF 7-11 at pp. 16, 18.  On August 17, 2021, PETA filed with this Court a Motion for A Preliminary Injunction, in which it argued that the provisions of the Contract are unconstitutional restrictions on its First Amendment rights.  *See generally* EFC 7-1.  In response, Shore Transit filed a Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction on September 13, 2021.  ECF 24.  Shore Transit also filed a Motion to Dismiss PETA's claims (the "Motion"), on September 9, 2021.  *See* ECF 23, 23–1. Pursuant to a Joint Motion to Extend Deadlines,[1] PETA filed a Combined Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction

---

[1] *See* ECF 17.

and in Opposition to Defendants' Motion to Dismiss (the "Opposition"). In PETA's

Opposition, it argues that the policies contained in the Contract are violative of

PETA's First Amendment rights, because those policies are allegedly: (1)

incapable of reasoned application; (2) discriminate based on viewpoint; and (3)

unconstitutionally vague and overbroad. *See* ECF 30-1. PETA alternatively

contends that the advertising spaces on/in Shore Transit's vehicles constitutes

a designated public forum and the policies contained in the Contract are

impermissible content-based restrictions. *Id.*

## ARGUMENT

### I. THE ADVERTISING SPACE IN SHORE TRANSIT'S VEHICLES CONSTITUTE A NONPUBLIC FORUM.

In its Opposition, PETA contends that the advertising space on Shore

Transit's vehicles is a designated public forum. *See* Opposition at p. 22. This is

not the case. Generally, courts have held that advertising space on public transit

vehicles constitutes a nonpublic forum, absent certain circumstances. *See White*

*Coat Waste Project v. Greater Richmond Transit Co.*, 463 F. Supp. 3d 661, 696–

97 (E.D. Va 2020) (on appeal) (commenting that "[n]early every court to consider

this question has concluded that advertising space on public transit systems is

a nonpublic forum."). Numerous other circuits, and this Court, have held that

advertising space contained on public transit vehicles constitute nonpublic

forums. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,

978 F.3d 481, 492–93 (6th Cir. 2020); *Am. Freedom Def. Initiative v.*

*Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 581 (1st Cir. 2015); James v.

Washington Metro. Area Transit Auth., 649 F. Supp. 2d 424, 428, 2009 WL 2487126 (D. Md. 2009) (noting that "City buses, for example, are not public fora"); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak),* 69 F.3d 650, 656 (2nd Cir. 1995); *Archdiocese of Washington v. Washington Metro. Area Transit Auth.,* 897 F.3d 314, 322 (D.C. Cir. 2018); *Anderson v. Milwaukee Cty.,* 433 F.3d 975, 979 (7th Cir. 2006); *Children of the Rosary v. City of Phoenix,* 154 F.3d 972, 977 (9th Cir. 1998); *Am. Freedom Def. Initiative v. King County,* 796 F.3d 1165, 1170 (9th Cir. 2015).

In addition to the above, in a prior correspondence to Shore Transit, PETA conceded that the "advertising space on public transit systems is a 'nonpublic forum' under the First Amendment." ECF 7–4 at pp. 2. In its Opposition, PETA cites only to *Christ's Bride Ministries, Inc. V. Southeastern Pennsylvania Transp. Auth.,* in support of its argument that the advertising space on Shore Transit's vehicles constitutes a designated public forum. *See* Opposition at p. 23. Although Shore Transit has not rejected many advertisements, this does not clearly imply that it has created a designated public forum. Instead, the overwhelming majority of the requests to advertise that Shore Transit has historically received, complied with the policies contained in the Contract. Moreover, the overwhelming weight of authority—including PETA's own admission and decisions by this Court—referenced *supra*—suggest that the advertising space in Shore Transit's vehicles is a non-public forum. Based on the above, the advertising space in Shore Transit's vehicles constitutes a non-

public forum, *see* Shore Transit's Motion to Dismiss at p. 11–14, and PETA's arguments to the contrary are unavailing.

## II. SHORE TRANSIT'S POLICY OF PROHIBITING POLITICAL ADVERTISEMENTS IS PERMISSIBLE AND REASONABLE UNDER *LEHMAN*.

In *Lehman v. City of Shaker Heights*, the Supreme Court upheld a transit agency's advertising policy that categorically prohibited "political advertising" within city buses. 418 U.S. 298, 299–306 (1974) (plurality opinion); *id.* at 307–08 (Douglas, J., concurring in judgment).[2] The Court's decision relied heavily on the unique forum at issue, *i.e.*, advertising space on public transit vehicles. *Id.* at 302. The Court observed that passengers on transit vehicles are a "captive audience[,]" that transit authorities engage in commercial ventures, and that they "must provide rapid, convenient, pleasant, and inexpensive service" to commuters within the area. *Id.* at 302–03. The Court also noted that advertising space on such vehicles is a part of the aforesaid commercial venture. *Id.* at 303.

The Court's holding in *Lehman* afforded transit authorities substantial discretion in determining which advertisements to allow on or in their vehicles:

> [i]n much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.

---

[2] The advertising policy analyzed in *Lehman* was a categorical ban on political advertising, like the one at issue here. *Id.* at 299 (noting that the advertising policy mandated that the transit authority "shall not place political advertising in or upon" the City's buses). The policy was not accompanied by a definition of the term "political" and there were no guidelines regarding its application.

*Id.* The Court expressly limited this authority by noting that a transit authority's rejection of advertisements "must not be arbitrary, capricious, or invidious." *Id.* There, the Court found that Shaker Height's prohibition of political advertising was neither arbitrary, capricious, or indeciduous. *Id.* at 303. Instead, the Court determined it is reasonable for transit authorities to prohibit both political and "issue-oriented advertisements[,]" because they could jeopardize the transit authority's ability to generate revenue. *Id.* at 304. The Court found that a transit's agency's decision to do so is reasonable, because transit agencies may wish to shield passengers from "the blare of political propaganda" and, instead, may limit advertising "space to innocuous and less controversial commercial and service oriented advertising." *Id.* That is exactly what Shore Transit has done in this case, to protect the pecuniary interest it maintains in the advertising space on its vehicles and to ensure that it is able to provide low-cost transportation to those in the community who require its services.

In a concurring opinion, Justice Douglas suggested that the Court's holding—in part—weighed heavily upon the nature of the forum involved. He noted that a "bus is plainly not a park or sidewalk or other meeting place for discussion," but is instead "only a way to get to work or back home." *Id.* at 306. Justice Douglas characterized buses as "a practical necessity for millions in our urban centers." *Id.* at 307. Although Justice Douglas had doubts as to whether the advertising space on public transit vehicles could be considered a First Amendment forum at all, he observed that the forum is more analogizable to a newspaper, a forum in which "the owner cannot be forced to include in his

offerings news or other items which outsiders may desire but which the owner abhors." *Id.* at 307 (citing *Miami Hearld Publishing Co. v. Tornillo*, 418 U.S. 241 (1974)). In his view, "if we are to turn a bus or streetcar into either a newspaper or a park, we take great liberties with people who because of necessity become commuters and at the same time captive viewers or listeners." *Id.* at 306–07. Justice Douglas also placed great weight on the rights of commuters:

> In asking us to force the system to accept his message as a vindication of his constitutional rights, the petitioner overlooks the constitutional rights of commuters. While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it. In my view the right of commuters to be free from forced intrusions on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience.

*Id.* at 307.

The analysis of both the plurality opinion and Justice Douglas' concurrence centered on the reasonableness of Shaker Height's decision to prohibit all political advertisements from its vehicles. The Court's analysis contains no reference to Shaker Height's definition of the term "political." Rather, in analyzing whether Shaker Height's policy was reasonable, the Court did not require Shaker Heights to define how it uses the term "political." The Court's decision logically follows from the proposition that "not every conclusion needs to be backed up by evidence . . . . courts can use 'common-sense' to 'uphold a regulation under reasonableness review.'" *Nat'l Assoc. for Advancement of Colored People v. City of Philadelphia*, 834 F.3d 435, 444 (3d Cir. 2016) (quoting *United States v. Kokinda*, 497 U.S. 720 (1990)).

In the years following *Lehman*, the Supreme Court has consistently cited to *Lehman* as an example of a constitutional restriction of speech based on subject matter. *See, e.g., Consolidated Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 539 (1980). The Court has also utilized *Lehman*'s arbitrary, capricious, or invidious standard in analyzing restrictions on speech in forums where a governmental entity maintains a proprietary interest. *See Kokinda*, 497 U.S. at 725–26. As a general principle, governmental entities have substantial discretion in determining the types of speech that may be excluded from such forums. *See U.S. Postal Serv. v. Council of Greenburgh Civic Assoc.*, 453 U.S. 114, 130 (1981).[3] The Court has cited *Lehman* for the proposition that transit authorities may permissibly "categorically prohibit advertising involving political speech." *AFDI v. King Cty.*, 136 S. Ct. at 1022–23; *Kokinda*, 497 U.S. at 725–26 (providing that *Lehman* permits a "ban on political advertisements"); *Cornelius*, 473 U.S. at 801. At its most basic, *Lehman* permits a transit authority to prohibit all advertising, which is deemed "political" from appearing on its

_____

[3] In conducting such analysis, the Supreme Court has oftentimes cited *Lehman* in conjunction with the Court's decision in *Greer v. Spock*, 424 U.S. 828 (1976), a case in which the Court upheld the government's right to prohibit partisan political speech on a military base. *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885–86 (2018); *Consolidated Edson Co. of N.Y. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 539 (1980); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 n.9 (1983); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 500–01 (1981). Accordingly, the Supreme Court has generally treated a transit authority's right to restrict speech in advertisements contained on its buses in a similar fashion to the military's authority to restrict speech on its facilities.

vehicles, a view that the Supreme Court has consistently upheld, endorsed, and applied.

Prior to this point, courts analyzing transit advertising policies have consistently interpreted Lehman and relied on the decision to uphold broadly worded restrictions on advertisements. *See, e.g., Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART), 698 F.3d 885, 889 (6th Cir. 2012), rev'd,* 978 F.3d 481; *Ridley v. MBTA*, 390 F.3d 65, 78-79 (1st Cir. 2004); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 978-79 (9th Cir. 1998); *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 654 (2d Cir. 1995), *op. amended on denial of reh'g*, 89 F.3d 39 (2d Cir. 1995), *cert. denied*, 517 U.S. 1188 (1996); *ACLU Found. v. WMATA*, 303 F. Supp. 3d 11, 27 (D.D.C. 2018); *Archdiocese of Washington v. WMATA*, 281 F. Supp. 3d 88, 101, 107 (D.D.C. 2017), *aff'd* 897 F.3d 314 (D.C. Cir. 2018), cert. denied, 140 S. Ct. 1198 (2020); *AFDI v. MTA*, 109 F. Supp. 3d 626, 632-34 (S.D.N.Y. 2015), *aff'd*, 815 F.3d 105 (2d Cir. 2016); *Vaguely Qualified Productions LLC v. MTA*, 2015 WL 5916699, at *7 (S.D.N.Y. Oct. 7, 2015), *appeal dismissed*, No. 15-3695 (2d Cir. Feb. 18, 2016); *Coleman v. AATA*, 947 F. Supp. 2d 777, 782-85 (E.D. Mich. 2013); *see also Planned Parenthood v. CTA*, 767 F.2d 1225, 1233 (7th Cir. 1985) (observing that *Lehman* upheld a "blanket exclusion of an entire class of potentially controversial speech"); *Lebron v. WMATA*, 749 F.2d 893, 896 n.6 (D.C. Cir. 1984). "Courts have [also] found that such a categorical ban against political advertising, even when inartfully phrased, provides sufficient guidance to restrict the discretion of the government actor[.]" *AMFDI v. MTA*, 109 F. Supp. 3d at 634.

In 2018, the Supreme Court decided *Mansky*, under which the Court held unconstitutional a Minnesota law banning "political" apparel at polling places, because the ban was not "capable of reasoned application." 138 S. Ct. at 1891. For a litany of reasons, the Court's decision in *Mansky* is distinguishable from the instant matter.

### III.    *MANSKY* IS DISTINGUISHABLE.

In PETA's Opposition, PETA takes the position that *Mansky* controls and that it has effectively abrogated the holding of *Lehman*. This is not the case. The Court's decision in *Mansky*, rather than abrogating *Lehman*, cited *Lehman* for the proposition that "the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." 138 S.Ct. 1876, 1885–86 (2018). Despite PETA's contentions, *Mansky* does not compel the outcome of this case and—simply put—*Mansky* did not upend nearly forty years of First Amendment jurisprudence concerning transit authorities' ability to restrict the content of advertisements in their vehicles. *See generally Lehman*, 418 U.S. 298.

First, as observed in Shore Transit's Motion to Dismiss, there are practical differences between the apparel ban in *Mansky* and this case. First, *Mansky* concerned a forum serving different purposes than the one at issue in this case, *i.e.*, voting. *Mansky*, 138 S. Ct. at 1886 (observing that "[t]he question accordingly is whether Minnesota's ban on political apparel is "reasonable in light of the purpose served by the forum: voting."). The purposes underlying the forum in *Mansky* are distinct from those identified in *Lehman* and those

applicable to Shore Transit's operation of its fleet of buses, *i.e.*, the captive nature of the audiences on public transit vehicles and a transit authority's pecuniary interest in such forums. Further, the political apparel ban at issue in *Mansky* applied to voters attending the polling places. *Id.* at 1888. Whereas, Shore Transit's policy applies to entities that wish to place advertisements on or in Shore Transit's vehicles. Shore Transit's policy would be comparable to the apparel ban at issue in *Mansky* if it limited items that passengers on Shore Transit's vehicles were permitted to wear or display while riding on Shore Transit's vehicles. *See id.* It does not. As intimated above, *Mansky* does not concern a forum in which a governmental entity maintains a proprietary interest, like the forum at issue in the present appeal and in *Lehman*. Based on these distinctions alone, it is quite clear that *Mansky* does not overrule *Lehman* and does not prohibit Shore Transit from categorically prohibiting political advertisements on its vehicles.

The Court's decision in *Mansky* hinged upon the way Minnesota's political apparel ban was applied. The Court primarily found Minnesota's political apparel ban was unworkable for several reasons, based on the circumstances underlying how such decisions were made and the subsequent guidance that Minnesota attempted to provide regarding the application of the prohibition. First, the political apparel ban in *Mansky* was enforced by election judges, who were temporary employees working at polling places. *Id.* at 1883. The decision regarding whether an item fell under the scope of the political apparel ban was left to such employees, who "screen[ed] individuals at the entrance to the polls[.]"

*Id.* at 1891. Although not expressly stated in the Court's decision, based on the number of individuals visiting polling places on election day and the limited number of election judges, those judges were required to make almost instantaneous decisions regarding whether a piece of apparel fell within the confines of the political apparel ban. This "snap judgment" is distinct from the informed internal review process that occurs when an entity wishes to place ads on Shore Transit's vehicles.

Further, although Minnesota issued guidance concerning the political apparel ban, the Court found that guidance unworkable, and relied heavily on that guidance in arriving at its ultimate conclusion—that Minnesota's ban on political apparel violated the First Amendment. *See id.* at 1884–91. As clarified through those guidelines, in addition to prohibiting items that contained the names of political parties, the policy in *Mansky* also prohibited "[a]ny item in support of or opposition to a ballot question at any election[,]" "[i]ssue oriented material designed to influence or impact voting[,]" and "[m]aterial promoting a group with recognizable political views[.]" *Id.* at 1884. In ascertaining what constitutes "issue oriented material designed to influence or impact voting" based on Minnesota's representations in its brief and during oral argument, the Court concluded that it is "any subject on which a political candidate or party has taken a stance." *Id.* at 1889. The Court observed that certain apparel is prohibited if candidates had "staked out" positions on a particular issue.

Therefore, the Court determined that the guidance rendered Minnesota's political apparel ban unconstitutional. *Id.* at 1889–90 ("A rule whose fair

enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable. Candidates for statewide and federal office and major political parties can be expected to take positions on a wide array of subjects of local and national import.").

Further, at oral argument, Minnesota represented that its ban on political apparel applied only to apparel "promoting groups whose political positions are sufficiently 'well known.'" *Id.* at 1890. The Court reasoned that this requirement "only increase the potential for erratic application[,]" because the determination of whether apparel fell under Minnesota's ban likely hinged "in significant part on the background knowledge and media consumption of the particular election judge applying it." *Id.* The Court also noted that the ban and the associated guidance resulted in an overwhelming lack of clarity as to the contours of its applicability, as evidenced by Minnesota's answers to hypothetical questions during oral arguments. *See id.* at 1890–91.

The same is not true in this case, because Shore Transit did not issue any similar—unworkable—guidance that would result in similar overarching ambiguities as to the application of Shore Transit's prohibition against political advertising. Additionally, unlike in *Mansky*, the decision of whether an item falls within the scope of Shore Transit's ban on political advertisements is not made by hundreds of temporary workers who are required to make split-second decisions concerning what is "political" under inherently inconsistent guidance.

Instead, Shore Transit's prohibition of political advertisements is reasonable under *Lehman*.

## IV. SHORE TRANSITS PROHIBITION OF OFFENSIVE AND CONTROVERSIAL ADVERTISEMENTS IS CONSTITUTIONAL.

In its Opposition, PETA relies on *Matal v. Tam* for the proposition that the provision of the Contract, under which Shore Transit reserves the right to reject any advertisements determined "to be controversial, offensive, objectionable or in poor taste[,]" ECF 7-11 at pp. 16, 18, constitutes viewpoint discrimination and therefore, is unconstitutional. 137 S. Ct. 1744 (2017).

Nonetheless, there are significant differences between this case and *Matal*. Primarily, *Matal* involved the registration of trademarks. *Id.* at 1751. The provision at issue in *Matal* was the disparagement clause of the Lanham act, which prohibited the registration of any trademark that may "disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." *Id.* at 1753 (alterations in original). As an initial matter, this policy is immediately distinguishable from Shore Transit's reservation of the right to reject certain types of advertisements under the Contract. The differences between *Matal* and the instant case do not end there.

Although the *Matal* Court suggested that the case was more akin to those involving limited public fora, it did not conduct any analysis concerning the type of forum at issue within the context of trademark registrations. *Id.* at 1763 (citing *Good News Club v. Milford Central School*, 533 U.S. 98, 106–07 (2001)). Although viewpoint discrimination is generally prohibited in both limited public

fora and nonpublic fora, the determination of whether a specific prohibition constitutes viewpoint discrimination may depend upon the nature of the forum involved and the governmental interests associated with that forum.

In *Planned Parenthood of S. Nevada, Inc. v. Clark County Sch. Dist.*, the Ninth Circuit inherently recognized that whether a prohibition against certain forms of advertising is reasonable, in part, depends on the context within which those advertisements will be made. 941 F.2d 817, 829–30 (9th Cir. 1991). Therein, the Court,

> agree[d] with the district court that the school district's policy of not publishing advertisements that are 'controversial, offensive to some groups of persons, that cause tension and anxiety between teachers and parents, and between competing groups such as [Planned Parenthood] and pro-life forces' is a reasonable one. Because of the possible perception of sponsorship and endorsement, schools within the district could choose to maintain a position of neutrality on a matter of political controversy and not lend their name and resources to Planned Parenthood's advertisements.

*Id.* (footnotes omitted). Essentially, although that case involved the inclusion of advertisements in school yearbooks, newspapers, and athletic programs, rather than advertising space on public transit, the principles are still relevant to this case. The Court held that the restrictions on controversial or offensive materials were reasonable considering the associated nonpublic forum and did not constitute viewpoint discrimination. *Id.* Like the Clark County School District in that case, Shore Transit's rejection of PETA's advertisement, because it was controversial and political, did not constitute viewpoint discrimination, as will be established more fully *infra.*

In Shore Transit's Motion to Dismiss, Shore Transit cited to the Second Circuit's decision in *Perry v. McDonald* for the proposition that a governmental entity may—in some instances—restrict speech which is deemed offensive. 280 F.3d 159, 167–68 (2nd Cir. 2001). In that case, the Second Circuit upheld the constitutionality of Vermont's decision to deny a vanity license plate with the term "SHTHPNS" on grounds that it was controversial and prohibited under Vermont's unwritten policy precluding it from issuing vanity license plates that contained scatological terms. *Id.* at 167–68.

In its reply, PETA takes the position that the Second Circuit's decision in *Wandering Dago, Inc. v. Destito* effectively abrogated the Court's holding in *Perry*. 879 F.3d 20, 33 (2018). *Wandering Dago* is more analogous to *Matal* than the instant case or *Perry*. Therein, the New York State Office of General Services denied an application made by a food truck operator to participate in the State's Summer Outdoor Lunch Program. *Id.* at 24. The vendor's application was denied on the basis its name was offensive because it contained the term "Dago"—an ethnic slur for individuals of Italian descent. *Id.* at 28. In analyzing the case, the Court determined that *Matal* was determinative, because that case involved a denial of a trademark registration based on the premise that the individual's requested trademark was offensive, because it contained an ethnic slur. *Id.* at 31, 33; *see also Matal*, 137 S.Ct. at 1751.

In determining that *Matal* controls, the Court justified its decision by concluding that "[i]n light of the clarification provided by *Matal*, therefore, we conclude that the District Court erred in its assessment: the undisputed facts

show that defendants did engage in viewpoint discrimination when they denied WD's Lunch Program applications solely because the WD truck and its products were branded with ethnic slurs." *Wandering Dago, Inc.*, 879 F.3d at 33. The Court also commented that "[g]iven *Matal*'s clarity on this point, we think it unnecessary to discuss at length earlier precedents that could be interpreted as supporting a different conclusion." *Id.* (footnote omitted).

In a footnote accompanying the preceding passage, the Second Circuit provided the following:

> In *Perry v. McDonald*, for example, we concluded that a state did not engage in unlawful viewpoint discrimination when it rejected a request for a "SHTHPNS" vanity plate, while at the same time allowing plates such as "COWPIES," "POOPER," and "BM." 280 F.3d 159, 170–71 (2d Cir. 2001). Although all the language on the plates was scatological, "SHTHPNS" was the only "offensive" plate because it contained "easily recognizable profanities." *Id.* **We held that the government was not targeting the worldview underlying the phrase "shit happens," but rather the use of profanities to express that philosophy, and that the latter objective did not amount to viewpoint discrimination.** Of course, following the Supreme Court's decision in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the state's rejection of the vanity plate might now be permitted on the alternative ground that the plate's language constituted government speech. —— U.S. ——, 135 S.Ct. 2239, 2246, 192 L.Ed.2d 274 (2015) ("[S]pecialty license plates issued pursuant to Texas's statutory scheme convey government speech.").

*Wandering Dago, Inc.*, 879 F.3d at 33 n.5 (emphasis added). Clearly, the Court did not abrogate the holding of *Perry*. Instead, it correctly noted that the issue concerning whether a governmental entity may limit speech simply because it contains a slur has been effectively determined by *Matal*. *Id.* Therefore, it was unnecessary for the Court to consider whether *Perry* would apply, considering

that *Matal* was directly on point, and similarity between the facts of the two cases. Moreover, the above passage contains no indication that the Second Circuit's decision in *Perry* has been abrogated or overruled. The only justifiable implication is that the Court distinguished *Perry* from that case and *Matal*.

Furthermore, Shore Transit was not engaging in viewpoint discrimination when it rejected PETA's proposed advertisements. Viewpoint discrimination occurs when a governmental entity rejects speech or imposes financial burdens on certain speakers based on the contents of their expression. *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 828–29 (1995). More specifically,

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. **The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.**

*Id.* at 829 (citations omitted) (emphasis added). In the words of the *Wandering Dago* Court, "[v]iewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination,' in which 'the government targets not subject matter but particular views taken by speakers on a subject.'" *Wandering Dago, Inc.*, 879 F.3d at 31.

This is simply not what occurred here. There is no indication that Shore Transit rejected PETA's proposed advertisement because of the message they intended to convey. Instead, Shore Transit rejected PETA's advertisements because of use of graphic imagery, including a bloody knife, and use of violent

terminology, including the word "kill." ECF 7-10 at pp. 2–3. Based on the use of these terms, Shore Transit determined that PETA's proposed advertisements were controversial (in addition to political) and could not be displayed within Shore Transit's vehicles. The fact that Shore Transit found the use of violent imagery and terms to be controversial or offensive within PETA's proposed advertisement is not based on any reference to the ideological message conveyed throughout PETA's advertisements. Moreover, PETA overlooks the fact that the constitutionality of Shore Transit's advertising restrictions must determined in reference to the purposes underlying the forum, *i.e.*, a commercial venture to provide transportation services, and the rights of those who Shore Transit serves, *i.e.*, commuters. *See Lehman*, 418 U.S. at 312–14 (Douglas, J., concurring). In consideration of these factors, the restriction Shore Transit places on advertising is inherently reasonable and does not constitute viewpoint discrimination. *See supra* at p. 3–5.

In its Opposition, PETA contends that Shore Transit admitted—in its Motion to Dismiss—that the decision to reject PETA's proposed advertisements was based on the viewpoint expressed therein, *i.e.*, advocating the closure of local businesses, this is not the case. As noted in the Motion to Dismiss, acceptance of PETA's proposed advertisements appears to be inconsistent with the statutory purposes underlying the Council's creation, *i.e.*, to "foster the physical, economic and social development of the region." Maryland Code, Economic Development § 13-802(c)(2)(i). In that section of the Motion to Dismiss, Shore Transit did not

indicate that its decision to reject PETA's proposed advertisement was based on the statutory purposes underlying the Council's creation.

Instead, that section of Shore Transit's Motion to Dismiss serves merely to demonstrate the potentially inconsistent result that would occur if Shore Transit were to accept PETA's advertisement and the potential conflict between that acceptance and the purposes the Council serves. *See* Motion to Dismiss at p. 9–10. As identified above, Shore Transit's rejection of PETA's proposed advertisements was based on the violent imagery contained therein, which would likely be found offensive by those that utilize Shore Transit's services out of necessity and would be forcibly subjected to those advertisements. In failing to recognize this point, "[PETA] overlooks the constitutional rights of commuters." *Lehman*, 418 U.S. at 307. In other words, there is no indication that Shore Transit's rejection of PETA's advertisements was based on the viewpoint expressed by PETA in the advertisements. Instead, the rejection was based on the use of offensive or controversial language and imagery within said advertisements. Any arguments to the contrary are unavailing.

## V. SHORE TRANSIT'S POLICIES ARE NOT UNCONSTITUIONALLY OVERBROAD OR VAGUE.

PETA alternatively contends that the provisions of the Contract are unconstitutionally overbroad. However, PETA fails to proffer that the overbreadth doctrine is to be used by the courts "sparingly and only as a last resort." *Giovani Carandola, Ltd. V. Bason*, 303 F.3d 507, 512 (4th Cir. 2002) (quoting *Broadrick*, 413 U.S. 601, 613 (1973)). Generally, "a law should not be invalidated for overbreadth unless it reaches a substantial number of

impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771 (1982). To prevail on such a claim, a plaintiff must "demonstrate that a regulation's overbreadth is 'not only . . . real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep,' and also that no 'limiting construction' or 'partial invalidation' could 'remove the seeming threat or deterrence to constitutionally protected expression." *Giovani Carandola, Ltd. V. Bason*, 303 F.3d 507, 512 (4th Cir. 2002).

In attempt to argue that Shore Transit's prohibition of placing controversial or offensive advertisements in its vehicles is substantially overbroad, PETA relies upon *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority* ("*UFCWU*"), for the proposition that a transit authority's policy of not placing controversial advertisements on its vehicles is unconstitutional under the overbreadth doctrine. 163 F.3d 341 (6th Cir. 1998). PETA avers that the policy contained in the Contract is "considerably broader" than the one at issue in that case. Opposition at p. 21. A closer examination of that case, however, reveals otherwise. In *UFCWU*, unlike here, the Court analyzed the potential overbreadth of an advertising policy that prohibited "[a]dvertising of controversial *public issues*." *Id.* at 362 (emphasis in original). In holding that the policy was unconstitutional overbroad, the Court determined that the policy's limited application to "controversial public issues" essentially rendered the policy unconstitutional:

> During the proceedings below, SORTA asserted that its advertising guidelines "have nothing to do with the viewpoint being expressed, but only with its mode of presentation." We simply do not see such

21

a limitation in the express language of SORTA's advertising policy. Rather, the policy's prohibition applies to "[a]dvertising of controversial public issues," which suggests to us that the prohibition is directly linked to the proposed advertisement's message. Moreover, the testimony of Jablonski demonstrates that SORTA itself does not in practice interpret its policy as suggested. J.A. at 477 (Jablonski Test. (testifying that under the policy, he would reject ads that conveyed "controversial viewpoints")). We therefore cannot discern a reasonable interpretation of the policy that will eliminate its overbreadth. Accordingly, we conclude that the policy's broad prohibition against controversial advertisements that may adversely affect SORTA's ridership threatens to chill protected expressive activity

*Id.* at 362–63. As apparent from the above excerpt, the Court held that the policy at issue in that case was overbroad, because it specifically applied only to controversial public issues. *Id.* In other words, the Court determined that the policy constituted viewpoint discrimination and had the potential to exclude a substantial amount of constitutionally protected speech. As identified *supra*, Shore Transit's policy makes no such distinction, and is not applied in reference to a particular viewpoint expressed in any proposed advertisements. Instead, Shore Transit's policy concerning offensive or controversial advertisements is limited to the form of said advertisements and not the ideas, sentiments, or viewpoints expressed therein. Based on the above, the policy at issue in *UFCWU* is distinguishable from those at issue in this case, in that the policy in that case impliedly required the transit authority to engage in impermissible viewpoint discrimination, which—in turn—rendered the policy substantially overbroad. The same cannot be said in this case because Shore Transit's policy is not tied to particular viewpoints and is administered only in reference to the form of said advertisements. This is particularly true where Shore Transit has only rejected

two advertisements, which evidences that the policies within the Contract are not likely to "reach[ ] a substantial number of impermissible applications." *Ferber*, 458 U.S. at 771.

In addition to the above, PETA contends that Shore Transit's policies of prohibiting political advertisements or those that are offensive or controversial are unconstitutionally vague. Nonetheless, PETA appears to contend that only Shore Transit's policy of prohibiting political advertisements from being placed in its vehicles is unconstitutionally vague.[4] In responding to Shore Transit's arguments that the vagueness doctrine may not apply under these circumstances, PETA admits that neither this Court, nor the Fourth Circuit have determined that advertising policies may be unconstitutionally vague. Although PETA cites to several cases from external jurisdictions involving vagueness challenges to distinguishable policies, generally those involved some form of penalties, unlike the policy contained within the Contract. *See Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 430, 442 (holding that a school dress code policy was unconstitutional vague, where a student was "punished for wearing a Confederate flag"); *Wag More Dogs, Ltd. Liability Corp v. Cozart*, 680 F.3d 359, 363 (2012) (involving a sign ordinance, under which violators are subject to fines, which steadily increase and noting that "[w]hen an individual has accrued $5000

---

[4] Based on the Opposition, it does not appear as if PETA is challenging the policy contained within the Contract of prohibiting advertisements that are deemed controversial or offensive under the vagueness doctrine. *See* Opposition at p. 15.

or more in fines, Arlington may prosecute the violation as a criminal misdemeanor").

Simply put, the examples relied upon by PETA are distinguishable, because they carry with them the potential to subject those who violate those policies to some form of punishment. Whereas, the only consequence of the application of the policy contained within the Contract is that applicants will be unable to have their advertisement placed in Shore Transit's vehicles. Moreover, given that *Lehman* is still good law, and affords transit authorities the discretion to prohibit the placement of political advertisements on their vehicles, it remains unclear how such a prohibition could be held to unconstitutional on vagueness grounds. Although PETA cites to *White Coats Waste Project* for the proposition that courts within the Fourth Circuit have held prohibitions against political advertisements to be unconstitutionally vague as applied, PETA fails to draw the Court's attention to the fact—in that section of its Opposition—that *White Coats Waste Project* is presently on appeal before the Fourth Circuit. Therefore, its application and ultimate precedential value of that decision is somewhat dubitable prior to the Fourth Circuit's decision in that case.

Nonetheless, Shore Transit's prohibition of political advertising is not unconstitutional under the vagueness doctrine, because "ordinary people can understand what conduct is prohibited" and it has not been utilized "in a manner that . . . encourage[s] arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). In its Opposition, PETA takes the position that the policy contained within the Contract would render individuals unable

24

to determine what types of advertisements would be prohibited. This runs contrary to the common-sense definition of "political," which courts can utilize to uphold a regulation. *U.S. v. Church*, 11 Fed.Appx. 264 (4th Cir. 2001); *see also Kokinda*, 497 U.S. 720 at 735. In other words, the definition of the word "political" as utilized in the Contract is relatively clear. *See* POLITICAL, Black's Law Dictionary (11th ed. 2019) (defining the term to mean "[o]f, relating to, or involving politics; pertaining to the conduct of government."). With this definition in mind, the type of speech which the policy contained with the Contract prohibits is abundantly clear. Moreover, as set forth *supra*, because Shore Transit has rejected few advertisements, there is no indication that the policy will be deployed in an arbitrary or discriminatory manner.

## CONCLUSION

Based on the foregoing, this Court should Grant Shore Transit's Motion to Dismiss.

Respectfully submitted,

KARPINSKI, CORNBROOKS & KARP, P.A.

BY: _____/s/ Kevin Karpinski_____
KEVIN KARPINSKI, #11849
AIS #9312150114
120 East Baltimore Street
Suite 1850
Baltimore, Maryland 21202-1617
410-727-5000
Kevin@bkcklaw.com
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of November 2021, the foregoing was electronically filed, with notice to:

Brian M. Hauss, Esquire
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004

Robin R. Cockey, Esquire
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, Maryland 21801
***Counsel for Plaintiff***

/s/ Kevin Karpinski
*Counsel for Defendants*
