## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PEOPLE FOR THE ETHICAL       *
TREATMENT OF ANIMALS, Inc.,

         *

    Plaintiff,

    v.                              *

                                    **CIVIL NO. JKB-21-02083**

SHORE TRANSIT et al.,         *

    Defendants.          *

    *      *      *      *      *      *      *      *      *      *      *      *

## MEMORANDUM

Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") brings suit for declaratory and injunctive relief against Defendants Shore Transit, Brad Bellacicco in his official capacity as Director of Shore Transit, and the Tri-County Council of the Lower Eastern Shore of Maryland ("Tri-County Council").. PETA brings suit under 42 U.S.C. § 1983, alleging that Defendants violated and continue to violate its First and Fourteenth Amendment rights by denying it permission to display two advertisements on Shore Transit's advertising space. Pending before the Court is Defendants' Motion to Dismiss. (ECF No. 23.) The Motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, the Motion to Dismiss will be DENIED.

### I. *Factual Background*[1]

PETA is a non-profit corporation that advocates for animal rights. (Compl. ¶ 10.) Tri-County Council is a regional council of governments established by the Maryland legislature,

---

[1] The facts in this section are taken from the Complaint. (*See generally* Compl., ECF No. 1.) The facts are construed in the light most favorable to PETA. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Shore Transit is a public transit agency and a division of the Tri-County Council, and Bellacicco is the Director of Shore Transit. (*Id.* ¶¶ 11–13.) Shore Transit operates the public bus system for Somerset, Wicomico, and Worcester Counties and allows advertising on the exterior and interior of its buses, in bus shelters, and on trash receptacles. (*Id.* ¶¶ 16, 18.) Shore Transit contracts with Vector Media ("Vector"), an advertising agency, to manage its advertising. (*Id.* ¶ 20.)

On May 12, 2020, PETA submitted two proposed advertisements to Shore Transit through Vector. (*Id.* ¶ 31.) Both included the text "No one needs to kill to eat. Close the slaughterhouses: Save the workers, their families, and the animals." (*Id.*) One has the word "kill" superimposed on a bloody cleaver; the other includes an image of a child holding a chicken. (*Id.*) Mark Sheely (Vector's Regional Manager) forwarded the proposed advertisements to Bellacicco, asking if Vector had permission to sell PETA exterior bus advertisement space to display them. (*Id.* ¶ 32.) On May 15, 2020, Sheely forwarded PETA Bellacicco's response: "After considerable consideration, we will decline the PETA ads. We find them too offensive for our market and political in nature." (*Id.* ¶ 33.)

On March 24, 2021, PETA filed a Maryland Public Information Act ("MPIA") request with the Tri-County Council seeking, *inter alia*, "all documents relating to Shore Transit's standards for accepting or rejecting advertisements, including any advertising policy Shore Transit may administer" and "all documents concerning Shore Transit's reasons for approving, not approving, or requesting modifications to advertisements submitted for Shore Transit's system, including any communications with entities that submitted advertisements for approval." (*Id.* ¶ 21 (alterations omitted).)

In response, the Tri-County Council provided "Shore Transit's contract with Vector Media; meeting and agenda minutes; email correspondence concerning Shore Transit's rejection of

proposed advertisements promoting cannabis and cannabidiol (CBD) products; and the Maryland Locally Operated Transit Systems (LOTS) manual." (*Id.* ¶ 22.) Minutes from a July 29, 2015 meeting of the Tri-County Council's Executive Board indicate that Shore Transit's advertising agency "asked if political advertisements are to be accepted." (*Id.* ¶ 23.) The Executive Board determined to bring the question before the Tri-County Council at a September 23, 2015 meeting, wherein the Council discussed the issue and voted "to not accept political ads." (*Id.*) In addition, Shore Transit's contract with Vector directs Vector to "follow minimum standards in the approval of submitted advertising that will be displayed in the buses" and further specifies that "[p]olitical advertisements will not be accepted." (*Id.* ¶ 24.) Under the contract, Shore Transit "reserves the right to reject any advertising that it determines to be controversial, offensive, objectionable or in poor taste" and "reserves the right to remove any offensive advertising at any time." (*Id.* ¶ 25.) These terms are not further defined in the contract or in other documentation. (*Id.* ¶ 27.)

On March 31, 2021, presumably in response to PETA's MPIA request, Bellacicco forwarded the May 2020 email chain relating to the two PETA advertisements to several Tri-County Council members, explaining that "considering the COVID situation unfolding in the area poultry plants, it was decided not to accept these ads." (*Id.* ¶ 36.) He further noted that Shore Transit had previously rejected advertisements from a "marijuana dispensary on the grounds [that Shore Transit] drug test[s] [its] drivers per Federal law and should not promote the produce [sic] on our buses . . . . Our contract with Vector does allow us to review and reject ads." (*Id.*)

On July 22, 2021, PETA renewed its request to run the proposed advertisements with Shore Transit but has not received a response from Vector. (*Id.* ¶ 37.)

In addition to the minutes and contract between Shore Transit and Vector and the emails relating to the rejection of the proposed advertisements discussed above, the Tri-County Council

provided emails relating to the rejection of advertisements for cannabis and cannabidiol products. (*Id.* ¶¶ 28–29.) On February 28, 2018, Vector emailed Bellacicco asking whether Shore Transit would accept advertisements relating to medical cannabis. (*Id.* ¶ 28.) Bellacicco responded that "I have referred your question to [the Maryland Transit Administration] and the [Tri-County Council] Board. I doubt we will take their money because we are still firing people for smoking cannabis. Would be hypocritical to advertise it when we drug test." (*Id.* (alterations in original).) On March 10, 2020, Sheely emailed Bellacicco to ask if Shore Transit would accept advertisements for medical cannabis and cannabidiol products. (*Id.* ¶ 29.) Bellacicco responded: "Sorry but no. We have Federal Transportation funding and comply with FTA Drug and Alcohol testing program. Would be hypocritical to advertise for marijuana and fire people for using it." (*Id.*) When asked whether Shore Transit would accept advertisements for cannabidiol products only, Bellacicco responded: "No we need to be careful with the perception of supporting a position opposed to [the Federal Transit Administration] and risk our funding." (*Id.*)

PETA brings two causes of action under 42 U.S.C. § 1983. Count I alleges violations of the First and Fourteenth Amendments. (*Id.* ¶¶ 39–47.) PETA argues that Shore Transit's policy prohibiting advertisements that it deems to be political, controversial, offensive, objectionable, or in poor taste violates the First Amendment on its face and as applied to PETA's advertisements, regardless of whether the advertising space is a designated public forum or nonpublic forum. (*Id.* ¶ 41.) PETA so argues because Shore Transit's prohibitions: (1) "constitute an impermissible content-based restriction on speech in a designated public forum"; (2) "are incapable of reasoned application"; (3) "afford unfettered discretion to enforcement officials"; (4) "discriminate on the basis of viewpoint"; and (5) "are substantially overbroad." (*Id.* ¶¶ 43–47.) Count II alleges violations of the Fourteenth Amendment, arguing that Shore Transit's prohibitions "are

4

impermissibly vague because they do not provide adequate notice about what speech is prohibited and invite arbitrary or selective enforcement." (*Id.* ¶¶ 48–49.)

## II.   *Legal Standard*

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 446 U.S. at 662. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

## III.   *Analysis*

PETA alleges that Defendants have violated its First and Fourteenth Amendment rights in rejecting its proposed advertisements and in prohibiting advertisements that Defendants deem to be "political" or "controversial, offensive, objectionable, or in poor taste." PETA sufficiently alleges that Defendants have violated its First Amendment rights because the prohibitions fail to provide workable standards and are viewpoint discriminatory. Further, for similar reasons, PETA has sufficiently alleged that Defendants' prohibitions are unconstitutionally vague. As such, PETA's claims will survive dismissal.

## A.   First Amendment[2]

"The first inquiry a court must undertake when a First Amendment claim is asserted is

whether the plaintiff has engaged in 'protected speech.'" *Goulart v. Meadows*, 345 F.3d 239, 246

(4th Cir. 2003) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797

(1985)).   Here, the parties to do not dispute that PETA's proposed advertisements constitute

"protected speech" and the Court finds that PETA was engaged in protected speech. *See NAACP*

*v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citation and quotations omitted) ("This

Court has recognized that expression on public issues has always rested on the highest rung of the

hierarchy of First Amendment values.").

Next, the Court "must identify the nature of the forum, because the extent to which the

Government may limit access depends on whether the forum is public or nonpublic." *Cornelius*,

473 U.S. at 797. And "[f]inally, we must assess whether the justifications for exclusion from the

relevant forum satisfy the requisite standard." *Id.* As described more fully below, Shore Transit's

advertising space is likely a nonpublic forum and, as alleged, Defendants' advertising prohibitions

are not reasonable or viewpoint neutral, as is required for a nonpublic forum. Thus, the Court will

not dismiss PETA's First Amendment claims against Defendants.[3]

---

[2] PETA challenges Defendants' prohibitions both facially and as applied to its proposed advertisements. The Supreme Court has explained that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). And, while "[t]he distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court," it does not go to "what must be pleaded in a complaint." *Id.*

[3] PETA also alleges that Defendants' prohibitions are overbroad, in violation of the First Amendment. In general, such claims are considered to be "strong medicine . . . which courts use sparingly and only as a last resort. Thus, a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 512 (4th Cir. 2002) (quotations omitted) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) and *New York v. Ferber*, 458 U.S. 747, 771 (1982)). Therefore, PETA must show that the policy's overbreadth is not only "real, but substantial as well, judged in relation to [its] plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. Because the Court finds that PETA has plausibly alleged that Defendants' prohibitions are unconstitutional for other reasons and therefore does not dismiss PETA's First Amendment claim,

### 1. *Forum*

Because PETA's claims survive dismissal under the more lenient standard applicable to a nonpublic forum, the Court does not find it necessary at this stage to conclusively determine whether Shore Transit's advertising space is a public or nonpublic forum. However, as alleged, the facts suggest that the advertising space is best characterized as a nonpublic forum.

There exist three types of forums: the traditional public forum, the designated public forum, and the nonpublic forum.[4] Traditional public forums are those places which "by long tradition or by government fiat have been devoted to assembly and debate," such as public streets and parks. *See Cornelius*, 473 U.S. at 802 (citations and quotations omitted). A designated public forum is "created by government designation . . . for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* The nonpublic forum is a forum "which is not by tradition or designation a forum for public communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). These distinctions have a practical effect. With respect to a traditional or designated public forum, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to

---

the Court does not find it necessary to reach the overbreadth argument at this stage. However, the Court will not foreclose PETA's ability to challenge the policy's overbreadth if necessary at a later stage.

[4] For purposes of this Memorandum, the Court will refer to traditional public, designated public, and nonpublic forums. The Fourth Circuit has used the terms "designated public form" and "limited public forum" interchangeably. *See Goulart*, 345 F.3d at 250 (explaining that, in a prior case, it "treated the terms 'designated public forum' and 'limited public forum' as two names for the same forum"); *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019) (citation, quotations, and alterations omitted) ("'Limited' or 'designated' forums are forums that are not traditionally public, but that the government has purposefully opened to the public, or some segment of the public, for expressive activity."). However, in *Child Evangelism Fellowship of Md., Inc.v. Montgomery Cnty. Pub. Schools*, 457 F.3d 376, 382 (4th Cir. 2006), the Fourth Circuit distinguished between designated and limited public forums. Other courts use the terms "nonpublic forum" and "limited public forum" interchangeably. *See, e.g., Seattle Midwest Awareness Campaign v. King Cnty.*, 781 F.3d 489, 496 n.2 (9th Cir. 2015) ("The label doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums."). Because the Court finds that Shore Transit's advertising space is likely a nonpublic forum and therefore assesses Defendants' advertising prohibitions under the most lenient standard—whether the policy is reasonable and viewpoint neutral—the potential distinctions between designated and limited public forums are inapplicable at this stage.

effectuate a compelling state interest." *Id.* at 46; *see also Pleasant Grove City, Utah v. Summum,* 555 U.S. 460, 469–70 (2009) ("Government restrictions on speech in a 'designated public forum' are subject to the same strict scrutiny as restrictions in a traditional public forum."). The nonpublic forum, on the other hand, is "governed by different standards." *Perry Educ. Ass'n,* 460 U.S. at 46. A government may limit access to a nonpublic forum "so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806.

To determine the type of forum at issue, the Court must "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum . . . . The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent." *Id.* at 802 (citing *Perry Educ. Ass'n,* 460 U.S. at 47). "To maintain a nonpublic forum, the government must employ 'selective access' policies, whereby forum participation is governed by 'individual, non-ministerial judgments.'" *Child Evangelism Fellowship of Md., Inc.,* 457 F.3d at 381 (quoting *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 680 (1998)).

In the context of public transit advertising specifically, courts have generally found that, where transit authorities have not opened their advertising spaces to a wide array of political speech, the advertising space constitutes a nonpublic forum. For instance, in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304 (1974), a plurality of the Supreme Court concluded that a public transit authority that categorically prohibited advertising involving political speech did not create a "First Amendment forum."[5] *See also Child. of the Rosary v. City of Phoenix,* 154 F.3d 972, 978

---

[5] The Court in *Lehman* did not categorize the advertising space as a "nonpublic forum." This is because *Lehman* was decided prior to the Supreme Court's articulation of the "tripartite framework for determining how First Amendment interests are to be analyzed with respect to Government property." *United States v. Kokinda,* 497 U.S. 720, 726 (1990). However, many courts have since explained that the advertising space at issue in *Lehman* was a nonpublic

(9th Cir. 1998) (explaining that public transit advertising space constituted a nonpublic forum where the city "consistently promulgate[d] and enforce[d] policies restricting advertising on its buses to commercial advertising"). However, where transit authorities have opened their advertising spaces to all manner of political and public issue advertising, some courts have found that the government has created a designated public forum, while others have still found that such advertising space is a nonpublic forum. *See Freedom Def. Initiative v. King Cnty., Wash.*, 577 U.S. 1202 (2016) (Thomas, J., dissenting from denial of certiorari) (explaining that a plurality of the Court in *Lehman* "concluded that a public transit authority that categorically prohibits advertising involving political speech does not create a public forum" but that "many transit authorities have instead opened their advertising spaces to a wide array of political speech, and courts of appeals are divided on what type of forum this creates").

Given PETA's allegations, it seems likely that Shore Transit's advertising space is a nonpublic forum. Most notably, PETA has alleged that Defendants' advertising restrictions ban advertisements that are political, controversial, offensive, objectionable, or in poor taste, and that Shore Transit reserves the right to reject advertisements that it deems to be in violation of these standards. This indicates that Shore Transit did not intend to create a public forum, as it has provided only "selective access" to the advertising space, where "permission is contingent upon non-ministerial judgments." *See Child Evangelism Fellowship of S.C. v. Anderson School Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) (citations and quotations omitted).

However, that Defendants have allegedly rejected only two sets of advertisements (i.e. the proposed PETA advertisements and the proposed cannabis-related advertisements) suggests that

---

forum. *See, e.g., Shopco Distribution Co. v. Commanding Gen. of Marine Corps Base, Camp Lejeune, N. Carolina*, 885 F.2d 167, 172 n.5 (4th Cir. 1989) (referring to the advertising space in *Lehman* as a nonpublic forum).

they may have otherwise accepted a wide variety of advertisements. The Court will therefore not foreclose PETA's ability to later argue that Shore Transit's advertising space is a designated public forum to which a more stringent standard would apply. *See Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018 (D.C. Cir. 1988) (explaining that, in the context of a forum analysis, "identifying the government's intent . . . raises inherently factual issues that cannot be resolved on a Rule 12(b)(6) motion").

### 2. *Standard in a Nonpublic Forum*

As noted above, the Court assumes for the purposes of resolving the instant Motion that Shore Transit's advertising space is a nonpublic forum, where a more permissive standard applies to government restrictions on speech. Any regulation on speech in a nonpublic forum must be "reasonable in light of the purpose served by the forum and . . . viewpoint neutral." *Cornelius*, 473 U.S. at 806. The Court finds that, as alleged, Defendants' prohibition on advertisements that it deems to be political, controversial, offensive, objectionable, or in poor taste does not satisfy even this "forgiving test." *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

#### a. *Reasonable*

PETA has sufficiently alleged that Defendants' advertising restrictions fail to provide objective or workable rules. Assuming Shore Transit's advertising space is a nonpublic forum, Defendants are of course free to impose certain limitations on the access to that space, which could include restrictions on political speech. However, any such limitations must be capable of reasoned application. As alleged, the limitations do not meet this standard.

##### i. *Applicability of* **Lehman** *and* **Mansky**

As an initial matter, the parties disagree on the applicability of two Supreme Court decisions, *Lehman* and *Mansky*, to this case. As described more fully below, read together, these

cases explain that, while the government may impose content-based restrictions on political advocacy in a nonpublic forum, it may not do so without providing objective and workable standards.

In *Lehman*, the Supreme Court considered "whether a city which operates a public rapid transit system and sells advertising space for car cards on its vehicles is required by the First and Fourteenth Amendments to accept paid political advertising on behalf of a candidate for public office." *Lehman*, 418 U.S. at 299. The petitioner, a political candidate, argued that the car cards constituted a "public forum protected by the First Amendment" and that the city of Shaker Heights was therefore required under the First Amendment to display his campaign advertisement. *Id.* at 301. Further, "uncontradicted testimony at the trial [indicated] that during the 26 years of public operation, the Shaker Heights system . . . had not accepted or permitted any political or public issue advertisement on its vehicles." *Id.* at 300–01. A plurality of the Court explained that "[b]ecause state action exists, however, the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious." *Id.* at 303. The Court further explained that "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles" and that, in opening space up for advertising, the government had not turned the car cards into a "First Amendment forum." *Id.* at 303–04.

In *Mansky*, petitioners challenged a Minnesota statute that prohibited certain apparel in polling places. *Mansky*, 138 S. Ct. at 1882. The statute prohibited, *inter alia*, any "political badge, political button, or other political insignia." *Id.* at 1883. A policy, which was issued to provide further guidance, provided examples of apparel falling within the ban: "[a]ny item including the name of a political party in Minnesota, such as the Republican, [Democratic–Farmer–Labor],

11

Independence, Green or Libertarian parties"; "[a]ny item including the name of a candidate at any election"; "[a]ny item in support of or opposition to a ballot question at any election"; "[i]ssue oriented material designed to influence or impact voting"; and "[m]aterial promoting a group with recognizable political views." *Id.* at 1884.

The Supreme Court concluded that the polling place was a nonpublic forum and, therefore, that any prohibitions on speech had to be viewpoint neutral and reasonable. *Id.* at 1886. Although the Court could find "no basis for rejecting Minnesota's determination that some forms of advocacy should be excluded from the polling place," the Court explained that the Minnesota had not "draw[n] a reasonable line." *Id.* at 1887–88. The Court explained that "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out," and "the unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to [the] Court, cause Minnesota's restriction to fail even this forgiving test." *Id.* at 1888. Government discretion "must be guided by objective, workable standards. Without them, an election judge's own politics may shape his views on what counts as 'political.'" *Id.* at 1891.

In particular, the Court explained that the term "political" was imprecise and could be "expansive" and found the additional guidance to be unhelpful. *Id.* at 1888–89. The Court found that the first three examples—items "including the name of a political party in Minnesota"; "including the name of a candidate at any election"; or "in support of or opposition to a ballot question at any election"—were "clear enough." *Id.* at 1889–90. However, the final two—"[i]ssue oriented material designed to influence or impact voting" and "[m]aterial promoting a group with recognizable political views"—were unclear and did not provide voters with adequate guidance as to what items could or could not be worn. *Id.* ("Would a 'Support Our Troops' shirt be banned, if

12

one of the candidates or parties had expressed a view on military funding or aid for veterans? What about a '# MeToo' shirt, referencing the movement to increase awareness of sexual harassment and assault?"). In short, while Minnesota's desire to eliminate political messaging from its polling places was a constitutionally permissible goal, "Minnesota ha[d] not supported its good intentions with a law capable of reasoned application." *Id.* at 1892.

*Mansky* is best read to refine—rather than abrogate—*Lehman*. These two cases explain that, in a nonpublic forum, a government may seek to exclude forms of political advocacy. However, in so doing, the government must provide a "sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888. *See also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. ("AFDI v. SMART")*, 978 F.3d 481, 494 (6th Cir. 2020) (citing *Mansky*, 138 S. Ct. 1876 and *Lehman*, 418 U.S. 298) (explaining that, while a ban on political ads may serve "permissible ends," the ban must still provide "objective, workable standards" to achieve those ends); *Zukerman v. United States Postal Serv.*, 961 F.3d 431, 451 (D.C. Cir. 2020) (explaining that the Supreme Court cited approvingly to *Lehman* "even as it struck down Minnesota's blanket ban on 'political' apparel as unworkably broad"); *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 315 (3d Cir. 2020), cert. denied, 142 S. Ct. 73 (2021) (rejecting transit authority's argument that *Lehman* required finding a ban on political advertisements to be constitutional).

### ii.   Objectivity and Workability of Defendants' Advertising Prohibitions

Here, PETA has sufficiently alleged that Defendants' advertising restrictions are unreasonable because they are neither "objective" nor "workable." *Mansky*, 138 S. Ct. at 1891. Assuming that Shore Transit's advertising space is a nonpublic forum, Defendants' desire to limit certain content within its transit system—including advertisements that are "political" in nature—

may be reasonable. *See id.* at 1887 ("In any event, we see no basis for rejecting Minnesota's determination that some forms of advocacy should be excluded from the polling place.") However, as alleged, the prohibition on advertisements that are "political," "controversial, offensive, objectionable, or in poor taste" fails to provide a "sensible basis for distinguishing what may come in from what must stay out." *See id.* at 1888. Indeed, the term "political" is the exact term at issue in *Mansky*, and the additional terms—"controversial, offensive, objectionable, or in poor taste"—provide no additional limiting guidance. While Defendants argue that there is no suggestion that the advertising prohibitions have the potential for haphazard application, it is precisely this lack of clarity that allows for haphazard application. *See id.* at 1891 ("But [an official's] discretion must be guided by objective, workable standards. Without them, an [official's] own politics may shape his views on what counts as 'political.'"); *see also In re Murphy-Brown, LLC*, 907 F.3d 788, 800 (4th Cir. 2018) (citations and quotations omitted) (explaining that *Mansky*'s "core requirement of clarity avoids twin problems": the "risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable" and "the risk of discriminatory or arbitrary enforcement").

Defendants' arguments that *Lehman* compels the Court to find the advertising prohibitions to be constitutional and that this case is distinguishable from *Mansky* are unavailing. Although *Lehman* is similar to this case in some regards, it does not require this Court to accept as constitutional any public transit ban on political advertisements. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1159 (7th Cir. 1995) ("The fact that *Lehman* . . . upheld a policy of excluding political advertisements in public buses hardly determines the reasonableness of such a restriction for all time."). Further, *Lehman* was decided on a developed factual record, which indicated that "during the 26 years of public operation [the transit system]

14

had not accepted or permitted any political or public issue advertisement on its vehicles" and that there was no evidence of arbitrary, capricious, or invidious enforcement. *Lehman*, 418 U.S. at 300–302. There is no such robust factual record currently before the Court, and the Court therefore cannot make any conclusions regarding the types of advertisements Defendants generally permitted, nor whether Defendants have arbitrarily enforced the advertising prohibitions.

Further, Defendants argue that PETA's "reliance on *Mansky* is misguided to the extent that the policy at issue in *Mansky* applied to a different forum." (Mot. Dismiss Mem. Supp. at 21, ECF No. 23-1.) However, it is not clear why *Mansky* would be inapplicable simply because it related to a polling place, and the Supreme Court did not so limit its opinion. As explained above, the Supreme Court in *Mansky* determined that a polling place was a nonpublic forum and, as such, that restrictions on speech must be reasonable and viewpoint neutral. *Mansky*, 138 S. Ct. at 1886. That is the precise standard against which the Court now evaluates Defendants' advertising prohibitions. Further, several courts have examined transit authority policies in light of *Mansky* and have found vague policies—similar to those at issue here—to be unconstitutional. *See AFDI v. SMART*, 978 F.3d at 493 ("*Mansky* compels us to hold that [the transit system's] opaque definition of 'political' is unreasonable."); *Ctr. for Investigative Reporting*, 975 F.3d at 309, 313– 14 (explaining that a policy prohibiting, *inter alia*, "[a]dvertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues" is unconstitutional under *Mansky* because it is incapable of reasoned application); *Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth., WMATA ("AFDI v. WMATA")*, 901 F.3d 356, 361, 372–73 (D.C. Cir. 2018) (reversing summary judgment in favor of transit authority where it banned "advertisements intended to influence the public regarding an issue on which there are varying opinions" and remanding in light of *Mansky*);

*Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 654 (9th Cir. 2019) (explaining that court was "skeptical" that a transit authority's prohibition on advertisements "expressing or advocating an opinion, position, or viewpoint on matters of public debate about economic, political, religious or social issues" would survive a challenge to its definiteness and objectivity).

Additionally, Defendants argue that the advertising prohibitions are somehow more definite than the one at issue in *Mansky*. However, *Mansky* dealt with the precise term at issue here—"political"—in addition to other nebulous guidance. *See Mansky*, 138 S. Ct. at 1888. As alleged, there are no additional guidelines to limit Defendants' discretion in determining what constitutes an advertisement that is "political" or "controversial, offensive, objectionable, or in poor taste," and Defendants do not argue that there are any such additional guidelines. Far from helping Defendants in this case, this lack of limitations may enable Defendants to allow their "own politics [to] shape [their] views on what counts as 'political.'" *Id.* at 1891; *see also Ctr. for Investigative Reporting*, 975 F.3d at 316 (citing *Mansky*, 138 S. Ct. at 1891) (explaining that "the absence of guidelines cabining [the transit authority's] discretion in determining what constitutes a political advertisement actually suggests that, like the Minnesota statute in *Mansky*, the lack of 'objective, workable standards' may allow [the transit authority's] 'own politics [to] shape his views on what counts as 'political.''"); *Zukerman*, 961 F.3d at 450 (citations omitted) ("[T]he ill-defined term 'political' was seen by the Court in *Mansky* as a critical problem—a problem that the state's authoritative interpretations could not overcome . . . . The ill-defined term 'political' is the problem here too.").

Finally, Defendants argue that PETA's proposed advertisements "do not specifically contain an endorsement of a political candidate" but that they nonetheless "clearly implicate a

16

political agenda, in that they contain inherently political language." (Mot. Dismiss Mem. Supp. at 20.) While an endorsement of a political candidate is plainly "political," it is not so obvious that the statement "Close the slaughterhouses: Save the workers, their families, and the animals" is "inherently political," as Defendants suggest. This example only demonstrates the difficulty of interpreting the word "political." Given the wide variety of issues that enter the political arena at local, state, and national levels, absent further objective criteria, it is unclear how an entity charged with excluding "political" speech could do so in a principled way, or how an advertiser is to know what topics fall under this umbrella.

Because the criteria contained in Defendants' policy are insufficient to ensure principled, consistent application, PETA has sufficiently pled that Defendants' advertising prohibitions are unreasonable.

### b. *Viewpoint Neutral*

As alleged, the advertising prohibitions an not only unreasonable, they are also viewpoint discriminatory. "[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806. As the Fourth Circuit has explained, in both public and nonpublic forums, "a policy . . . that does not provide sufficient criteria to prevent viewpoint discrimination . . . generally will not survive constitutional scrutiny." *Child Evangelism Fellowship of Md., Inc.*, 457 F.3d at 387. Further, "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Id.* at 384 (emphasis in original).

Two Supreme Court cases provide pertinent guidance on the contours of viewpoint discrimination. In one case, the Supreme Court struck down the Lanham Act's prohibition on

federal registration of trademarks that "'disparage . . . or bring . . . into contemp[t] or disrepute' any 'persons, living or dead.'" *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (alterations in original) (quoting 15 U.S.C. § 1052(a)). The Court explained that this anti-disparagement clause was viewpoint discriminatory because "[g]iving offense is a viewpoint." *Id.* at 1763 (Alito, J., opinion); *see also id.* at 1766 (Kennedy, J., concurring in part and concurring in judgment) ("The law thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination."). In the second case, the Supreme Court struck down the Lanham Act's prohibition on "immoral or scandalous" trademarks because, like the prohibition the Court struck down in *Matal*, "it too disfavors certain ideas." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2297 (2019). The Court found that this prohibition "permit[ted] registration of marks that champion society's sense of rectitude and morality, but not marks that denigrate those concepts." *Id.* at 2299. The prohibition impermissibly "distinguishe[d] between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation." *Id.* at 2300.

Applying *Matal* and *Iancu*, courts have struck down public transit system policies that drew similar morality-based distinctions. The Sixth Circuit concluded that a public transit policy that prohibited advertisements reflecting "scorn or ridicule" was viewpoint discriminatory. *AFDI v. SMART*, 978 F.3d at 498 (citing *Matal*, 137 S. Ct. 1763, 1766). "[T]he restriction facially 'distinguishes between two opposed sets of ideas': those that promote the group and those that disparage it." *Id.* at 500 (citing *Iancu*, 139 S. Ct. at 2300). The Ninth Circuit found that a policy prohibiting "[a]dvertising that contains material that demeans or disparages an individual, group of individuals or entity" constitutes viewpoint discrimination under *Matal*. *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1130–31 (9th Cir. 2018). The Ninth Circuit explained that

18

"*Matal* applies with full force to the disparagement clause here." *Id.* at 1131. The clause "requires

the rejection of an ad solely because it offends. Giving offense is a viewpoint, so [defendant's]

disparagement clause discriminates, on its face, on the basis of viewpoint." *Id.*; *see also Ne. Pa.*

*Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 439 (3d Cir. 2019) (citing

*Iancu*, 139 S. Ct. at 2299–300) ("The censorship of messages *because* they are controversial is

viewpoint discrimination.").

Here, the prohibition on advertisements that are "controversial, offensive, objectionable or

in poor taste" is likewise viewpoint discriminatory.[6] These terms seem to prohibit the same thing:

advertisements that Defendants find offensive in some way. Therefore, in light of *Matal* and *Iancu*,

the advertising prohibitions are viewpoint discriminatory.

It would strain common sense for this Court to conclude that terms such as "objectionable"

or "in poor taste" withstand constitutional scrutiny while terms like "scandalous" or "immoral" do

not. Further, it is difficult to see how a policy that provides that "Shore Transit . . . reserves the

right to reject any advertising that it determines to be controversial, offensive, objectionable or in

poor taste," (Compl. ¶ 25), without any additional guidance, "provide[s] adequate safeguards to

*protect* against the improper exclusion of viewpoints." *Child Evangelism Fellowship of Md., Inc.*,

457 F.3d at 384 (emphasis in original). By its terms, application of the policy is contingent on

Defendants' own assessment of what may be offensive—providing ample opportunity for

---

[6] Whether the term "political" is viewpoint discriminatory is a closer call. Some courts have determined that such a term is not facially viewpoint discriminatory, because it bans any "political" speech, not certain types of political speech. *See, e.g., AFDI v. WMATA*, 901 F.3d at 368 (explaining that the court had "no trouble rejecting th[e] claim" that a ban on issue-oriented advertising is facially viewpoint discriminatory in light of *Lehman*). However, even a facially neutral law can be applied in a discriminatory manner. *See McCullen v. Coakley*, 573 U.S. 464, 484–85 (2014) (acknowledging that a facially neutral law could be subject to an as-applied challenge if it were enforced selectively). That said, because the Court finds that the ban on "political" advertisements is unreasonable as formulated, and because the remaining constitutionally deficient language does nothing to cure the policy in its entirety, the Court need not conclusively determine whether it is also viewpoint discriminatory.

Defendants to improperly exclude speech on the basis of viewpoint. Further, the policy does not even require Defendants to reject advertisements it deems offensive, it merely reserves Shore Transit's right to do so.

Additionally, as PETA alleges, Defendants rejected the advertisements due to "the COVID situation unfolding in the area poultry plants" and because the advertisements were deemed "too offensive for [Shore Transit's] market and political in nature." (Compl. ¶¶ 33, 36.) These allegations suggest that PETA's advertisements were indeed rejected for viewpoint discriminatory reasons. First, the allegation that the advertisements were rejected given the "COVID situation unfolding in the area poultry plants" suggests that the advertisements may have been rejected in "an effort to suppress expression merely because public officials oppose the speaker's view." *See Perry Educ. Ass'n*, 460 U.S. at 46. Second, Defendants concede that the advertisements were rejected, at least in part, due to their offensiveness. (Mot. Dismiss Mem. Supp. at 25 (explaining that the "denial was focused on the offensive aspects of the content of PETA's proposed advertisements, and not any viewpoint expressed therein" and that "[a] reasonable mind" would find that PETA's proposed advertisements are, in fact, offensive because of the image of the bloody cleaver and the use of the word "kill").) As explained above, the perceived offensiveness of the advertisements cannot serve as a viewpoint neutral reason for rejecting them. *See Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring in part and concurring in judgment) (explaining that "the essence of viewpoint discrimination" is the government's "disapproval of a subset of messages it finds offensive"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). The Court's conclusion that PETA has sufficiently alleged that Defendants rejected PETA's

advertisements for viewpoint discriminatory reasons is bolstered by Defendants' own statement that they could not accept the advertisements because they espoused an anti-business viewpoint. (*See* Mot. Dismiss Mem. Supp. at 9–10 (explaining that Defendants could not accept the proposed advertisements because Shore Transit and the Tri-County Council are statutorily required to promote the physical, economic, and social development in the region, and the advertisements suggest that businesses within the region should be closed).)

Defendants note the unique nature of advertising space in public transit and argue that the extent to which Defendants' prohibition "is permissible under the First Amendment must be analyzed within the context of the forum in which it occurs." (*Id.* at 25.) However, as the Fourth Circuit has explained, "[t]he ban on viewpoint discrimination is a constant." *Child Evangelism Fellowship of S.C.*, 470 F.3d at 1067; *see also Child Evangelism Fellowship of Md., Inc.*, 457 F.3d at 387 (explaining that "even in cases involving nonpublic or limited public forums," a policy that allows or fails to prevent viewpoint discrimination "generally will not survive constitutional scrutiny"); *AFDI v. SMART*, 978 F.3d at 501 ("For decades, the Supreme Court has said that even in nonpublic forums—the forums in which the government has the most leeway to regulate speech—the government may still not engage in viewpoint discrimination . . . . [Defendant] identifies no case suggesting that the meaning of 'viewpoint discrimination' can change depending on the context in which it is used."); *Ne. Pa. Freethought Soc'y*, 938 F.3d at 436 ("[T]he type of forum sheds no light on whether a policy or decision discriminates against a certain viewpoint.").

While the Court is certainly sympathetic that Defendants may have an interest in limiting graphic or gory imagery on its buses, the manner in which Defendants allegedly have done so appears to be neither viewpoint neutral nor reasonable. PETA's First Amendment claims therefore survive dismissal.

## B.    *Fourteenth Amendment*

PETA's Fourteenth Amendment claim will also survive dismissal because PETA has sufficiently alleged that Defendants' prohibitions are vague.

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citations omitted). As discussed above, PETA has sufficiently alleged that Defendants' prohibitions fail to provide clear or workable standards or to protect against arbitrary enforcement. *See AFDI v. WMATA*, 901 F.3d at 372 (explaining that "the overlap in analysis between unbridled discretion and vagueness is clear; both doctrines require a court to determine whether a decisionmaker's exercise of discretion in allowing or disallowing speech is based upon objective and clear standards.").

The Court appreciates that the advertising prohibitions at issue here are contained in meeting minutes and in a contract between Shore Transit and Vector, rather than in statutes imposing criminal or civil penalties. And although the "degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982), this does not necessarily lead the Court to conclude that advertising prohibitions can never violate the Fourteenth Amendment. Indeed, the Fourth Circuit has examined whether school dress codes and sign ordinances are unconstitutionally vague. *See Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013); *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 370–72 (4th Cir. 2012). Further, courts must consider whether the enactment "inhibit[s] the exercise of constitutionally protected rights." *Vill. of Hoffman Ests.*, 455 U.S. at

22

499. Where "the law interferes with the right of free speech . . . a more stringent vagueness test should apply." *Id.* That is the right at issue here.

Therefore, on balance and given the nature of the rights at stake and the nature of the prohibition, PETA's Fourteenth Amendment claim will not be dismissed at this stage.

## IV.   *Conclusion*

For the reasons set forth in the foregoing Memorandum, Defendants' Motion to Dismiss (ECF No. 23) will be DENIED.


DATED this *18* day of January, 2022.

BY THE COURT:

James K. Bredar
Chief Judge

23